IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GLOBAL TOWER, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | NO. 3:10-CV-01705-ARC |
| | : | |
| v. | : | JUDGE: A. Richard Caputo |
| | : | |
| HAMILTON TOWNSHIP | : | |
| | : | **JURY TRIAL DEMANDED** |
| and | : | |
| | : | |
| ZONING HEARING BOARD OF | : | |
| HAMILTON TOWNSHIP, | : | |
| | : | |
| Defendants. | : | |

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF GLOBAL TOWER, LLC'S MOTION FOR SUMMARY JUDGMENT

George Asimos, Esquire
Elizabeth U. Witmer, Esquire
Jennifer L. Beidel, Esquire
Atty. I.D. Nos. 49275, 55808, 204450
gasimos@saul.com
ewitmer@saul.com
jbeidel@saul.com
SAUL EWING, LLP
Penn National Insurance Plaza
2 North 2nd Street, 7th Floor
Harrisburg, PA 17101-1619
Phone: (717) 257-7553
Fax:    (717) 257-7583

*Attorneys for Plaintiff Global Tower, LLC*

Dated:      September 15, 2011

## TABLE OF CONTENTS

Page

A.   The Parties ...................................................................................... 1

B.   The Lease ........................................................................................ 1

C.   The Application .............................................................................. 3

D.   The Hearings .................................................................................. 6

E.   The Township Treated Other Towers Differently............................ 8

    1.   The Zoning Board Approved The Sprint Tower. .................... 9

    2.   The Zoning Board Approved The Pennsylvania Cellular Tower. ............ 12

F.   The Tower Would Not Adversely Affect The Character Of The District Where
It Is Located. .................................................................................. 15

G.   The Board Placed The Burden Of Proof Of Valuation On Global. ............... 15

H.   The Lease Was Not Intended To Create A New Lot.......................... 16

I.   The Tower Would Conform With All Regulations Applicable To
The C Zoning District And Appropriate Public Uses. ...................... 17

J.   The Tower Would Provide Adequate Landscaping And Screening
To Protect Adjoining Areas. .......................................................... 19

K.   The Tower Would Not Jeopardize The Public Health, Safety, Welfare,
Or Convenience. ............................................................................ 20

    1.   The Tower Would Not Jeopardize The Public Health, Safety,
Welfare, Or Convenience. ..................................................... 20

    2.   The Tower's Driveway Would Satisfy All Requirements. ......... 21

    3.   The Tower Would Provide A Sufficient Fall Zone. .................. 22

L.   The Tower Would Not Cause Substantial Injury To The Value Of
Other Property Where It Is Located. .............................................. 23

    1.   McKeown's Testimony Was Flawed. ..................................... 23

    2.   Doyle's Testimony Was Sound. ............................................ 26

TABLE OF EXHIBITS

Exhibit A – Application Hearing Transcript, dated April 7, 2009 to June 10, 2010

Exhibit B – Zoning Board Decision, dated July 14, 2010

Exhibit C – Hamilton Township Zoning Ordinance

Exhibit D – Photographic Simulation of the Proposed Global Tower

Exhibit E – Letter from Lloyd J. and Shirley M. Singer to the Zoning Hearing Board
of Hamilton Township, dated May 10, 2010; Letter from George Asimos
to the Zoning Hearing Board of Hamilton Township, dated June 10, 2010

Exhibit F – Letter from John Motz to Randy Hartmeyer, dated May 7, 2010

Exhibit G – Photographs of the Sprint Spectrum and Pa Cellular Towers

Exhibit H – Decision on the Sprint Spectrum Application, dated Feb. 1, 2000

Exhibit I – Decision on the Pa Cellular Application, dated Nov. 6, 1996

Exhibit J – PCS Site Agreement, dated Nov. 7, 1999

Exhibit K – Pa Cellular Notice of Land Use Appeal, dated Dec. 11, 1996

Pursuant to Local Rule 56.1, Plaintiff Global Tower, LLC ("Global") submits this statement of material facts as to which Global contends there is no genuine issue in support of its Motion for Summary Judgment.

## A.    The Parties

1.    Global is a company whose operations are essential to the provision of personal wireless (radio communications) services using advanced radio technology.   Among other activities, Global leases real estate on which it constructs radio towers and then sublets the use of those towers to FCC-licensed personal wireless communications providers.  (See generally Compl. ¶¶ 6-7.)

2.    Defendant Hamilton Township (the "Township") is a political subdivision located in Monroe County, Pennsylvania.  (Id. ¶ 2; Answer ¶ 2.)

3.    Defendant Zoning Hearing Board of Hamilton Township ("Zoning Board") is an instrumentality of the Township created under § 901 of the Pennsylvania Municipalities Planning Code, 53 P.S. § 10901.  (See generally Compl. ¶ 3.)

## B.    The Lease

4.    On December 16, 2008, Global Tower Assets, LLC, an affiliate of Global, entered into a lease agreement ("Lease") with Lloyd J. and Shirley M. Singer, as trustees of the Singer Trust ("the Singers").  The Lease was assigned to Global. (Compl. ¶ 17; Answer ¶ 17.)

5.     The Singers own a 30-acre tract of real property (the "Singer Tract") on Pensyl Creek Road in Hamilton Township, Monroe County, Pennsylvania. (Compl. ¶ 18; Answer ¶ 18.)

6.     The Singer Tract is in a rural area and is partly wooded and partly open fields.  Within the wooded area is a small shale rock quarry and a gravel drive leading to Pensyl Creek Road.  There is a barn on the Singer Tract, but there are no other uses or structures on the property.  <u>See</u> Application Hr'g Tr., 108:3-5, 108:19-24, 118:14-19, June 1, 2009; 295:8-23, June 17, 2009; 554:24-555:1, July 16, 2009, attached hereto as Exhibit "A"; <u>see also id.</u> 2013:1-3, April 12, 2010 ("So, in my opinion as a planner one would . . . expect[] to see a tower within a rural landscape such as we have here in Hamilton Township.").

7.     The purpose of the Lease was to allow Global to erect a radio tower and to install related equipment on the ground (collectively, the "Tower") inside a 100-foot by 100-foot leased area ("Leased Area") in a clearing adjacent to the shale rock quarry and surrounded by the wooded section of the Singer Tract.  <u>See</u> Zoning Board Decision (hereinafter, "Decision"), at 65-67, July 14, 2010, attached hereto as Exhibit "B."

8.     The Lease is for five years, commencing on the date of construction by Global.  The Lease also grants Global the option to extend the Lease for five

successive periods of five years each, for a total potential term of thirty years. See Application Hr'g Tr. 632:7-17, Aug. 24, 2009; 1305:13-22, Dec. 8, 2009.

9.     Global intends to sublease the Tower to Horizon Communications, Inc. ("Horizon"), also known as iPCS.   Horizon, operating under a license agreement with Sprint PCS, would use the Tower to mount antennas and related equipment and provide Sprint PCS's personal wireless services to the general public. See id. 1761:10-13, Feb. 3, 2010.

10.    Global intends to later make the Tower available for sublease to as many as three other competitors in the personal wireless services industry. See id. 188:10-189:3, June 17, 2009; 526:19-21, July 16, 2009; 654:10-25, Aug. 24, 2009.

## C.    The Application

11.    On February 17, 2009, Global, acting through its agent, Fortune Wireless, Inc., filed an application with the Zoning Board ("Application"), requesting "special use" approval to erect the Tower as an "Appropriate Public Use." (Compl. ¶ 29; Answer ¶ 29.)

12.    On February 2, 2010, Global filed an amended application, reducing the proposed height of the tower from 300 to 250-feet. See Decision at 10-11.

13.    Pursuant to the Application, the Tower is to consist of a 250-foot, three legged, lattice-type tower with clusters of antennas to be mounted in various

locations on the tower, with a 7-foot tall lightning rod on top.  (Compl. ¶ 21; Answer ¶ 21); see also Application Hr'g Tr. 190:23, 196:13, June 17, 2009.

14.    The Tower is to be constructed in accordance with national and local codes, subject to review by the Township code enforcement officer.  See Application Hr'g Tr. 189:22-190:7, June 17, 2009; 509:4-9, 544:18-545:3, 610:10-13, July 16, 2009; 2209:2-6, 2209:22-2210:9, 2212:8-2213:7, May 10, 2010.

15.    The Tower is to be unmanned and is not to require water or sewer service. See id. 124:4-10, June 1, 2009.

16.    The only two utilities required by the Tower are a telephone line and an electrical line, both of which would run underground.  See id. 515:23-516:5, July 16, 2009; 689:7-12, Aug. 24, 2009.

17.    Access to the Tower would be via the existing gravel drive, with minor improvements.  See id. 185:6-23, June 17, 2009, 503:22-504:13, July 16, 2009.

18.    Following "special use" approval but prior to construction, the design of the Tower and its foundation are to be completed and sealed by a professional engineer. See id. 2222:14-2223:1, May 10, 2010.  The sealed plans would then be reviewed by the Township for compliance with building codes before permitting. Id. 190:2-7, June 17, 2009.

19.    All maintenance on the Tower and the surrounding areas is to be provided by Global. See id. 1316:7-10, Dec. 14, 2009.

20.    The Tower's proposed location is distant from all neighboring properties and boundaries. The Tower would be 361 feet from Pensyl Creek Road, 474 feet from the northern boundary of the Singer Tract, 326 feet from the eastern boundary of the Singer Tract, and 260 feet from the southern boundary of the Singer Tract. See id. 122:17-20, June 1, 2009; 151:3-12, 167:14-17, 198:21-199:7, June 17, 2009.

21.    The Singer Tract is in the C Zoning District. (Compl. ¶ 23; Answer ¶ 23.)

22.    According to Section 402.2 of the Hamilton Township Zoning Ordinance ("Zoning Ordinance"), "[r]adio and television transmission or receiving tower[s]" are permitted in the C Zoning District as a special use. See Hamilton Township Zoning Ordinance (hereinafter "Zoning Ordinance"), § 402.2, at Z-30, attached hereto as Exhibit "C;" Decision at 49.

23.    Among the other uses allowed in the C District are multi-family residential buildings, commercial and limited commercial uses, light industrial uses, and accessory uses and essential services. See Application Hr'g Tr. 112:17-23, June 1, 2009.

24.    The C District is among the most intensively zoned districts in the Township.  See Decision at 15; see also Application Hr'g Tr. 115:18-116:2, June 1, 2009 (describing the C District as a "unique" or "transitional district" that allows for a "mix" of uses).

25.    Unlike the proposed Tower, several of the types of uses permitted in the C District typically generate high traffic, stormwater and erosion issues, and noise, odor and light pollution.  See Application Hr'g Tr. 116:12-117:5, June 1, 2009.

### D.    The Hearings

26.    The Hamilton Township Planning Commission ("Commission") reviewed the Application at its June 15, 2009 meeting.  (Compl. ¶ 30; Answer ¶ 30.)

27.    Thereafter, the Zoning Board held twenty evenings of hearings (the "Hearing") to consider the Application.  The twenty hearing dates spanned over one year, beginning on April 7, 2009 and ending on June 10, 2010.  (Compl. ¶ 31; Answer ¶ 31.)

28.    On March 17, 2010 from 7:00 a.m. to 9:00 a.m., the Zoning Board conducted a view of the Singer Tract, during which Global conducted a balloon float with the balloon reaching a height of approximately 250 feet above ground. Conditions were sunny with little to no wind.  See Decision at 5.   Global also

provided a photo simulation of the proposed Tower, showing its minimal impact on the surrounding community. See Photographic Simulation, attached hereto as Exhibit "D."

29.    During the Hearing, Global offered the expert testimony of three witnesses: (1) Frank Chlebnikow ("Mr. Chlebnikow"), an expert on land use, zoning, and community planning, (2) John Doyle ("Doyle"), an expert in real estate appraisals, and (3) Michael L. Bohlinger ("Mr. Bohlinger"), an expert in civil structural engineering. See Decision at 11, 18, 22.

30.    Objector Leopold Zappler offered Thomas McKeown ("McKeown") as a witness in general real estate appraisals and R. Douglas Olmstead, Jr., P.E. as an expert in civil engineering. See id. at 20, 35.

31.    At the conclusion of the Hearing, Global and the Singers agreed to the imposition of a number of conditions on the Application, a practice which is commonplace after lengthy zoning hearings. These conditions were intended to be responsive to the concerns raised during the Hearing. See Letter from the Singers to the Zoning Board, dated May 10, 2010 and Letter from George Asimos to the Zoning Board, dated June 10, 2010, attached hereto as Exhibit "E."

32.    The Zoning Board denied Global's Application in a written decision dated July 14, 2010. (Compl. ¶ 33; Answer ¶ 33.)

### E.    The Township Treated Other Towers Differently.

33.    The Zoning Board permitted two similar radio towers to be used for the same purpose on properties with similar characteristics to the Singer Tract, one in the same zoning district as the Leased Area.   Decision at 70; see also Application Hr'g Tr. 157:12-19 (discussing approval process of other towers), 157:23-158:4 (discussing location of the Sprint Tower in the C District), 158:25-159:4 (same), June 17, 2009.

34.    The photographs attached hereto as Exhibit "G" depict the Sprint and Pa Cellular Towers. See Photographs, attached hereto as Exhibit "G."

35.    These two similar towers were approved by the Zoning Board as special uses. See Application Hr'g Tr. 157:12-19, June 17, 2009.

36.    These two similar towers are occupied and used by providers of functionally equivalent services to those to be provided by the occupants of the proposed Tower.   See Decision on Sprint Spectrum Application (hereinafter, "Sprint Decision"), dated Feb. 1, 2000, at 15 (discussing provision of PCS services), attached hereto as Exhibit "H"; Decision on Pa Cellular Application (hereinafter, "Pa Cellular Decision"), dated Nov. 6, 1996, at 19 (discussing provision of cellular telephone services), attached hereto as Exhibit "I."

1.    **The Zoning Board Approved The Sprint Tower.**

37.    The Zoning Board approved the Sprint Spectrum LP tower (the "Sprint Tower") on February 1, 2000.  See Sprint Decision, at 17-20.

38.    In the Decision, the Zoning Board states:  the "testimony established that the Sprint Spectrum tower is analogous to the proposed cell tower."  See Decision at 81; see also Application Hr'g Tr. 2017:13-14, Apr. 12, 2010 ("So, the condition of the Sprint site and of the Singer site, in my opinion, are very similar.").

39.    The Sprint Tower is a lattice tower that is approximately 250 feet in height and is located along the Route 33/State Route 209 Corridor in the Township.  See Decision at 12, 61; see also Application Hr'g Tr. 592:1-5, July 16, 2009.

40.    Like the proposed Tower, the Sprint Tower is located in the C Zoning District in an area near the A District.  See Application Hr'g Tr. 157:23-158:4, 158:24-159:4, June 17, 2009; see also id. 158:1-4, June 17, 2009 ("[T]his site, the Sprint Spectrum site, is very similar to the Singer property site in that it is on the edge of the C district.").

41.    The character of the area around the Sprint Tower is primarily rural with some existing and planned subdivisions and road frontage developments.  See id. 158:24-159:15, June 17, 2009 ("The character of the area around the Sprint

Spectrum site is very similar to the area around the Singer property, the Global Towers site . . . . In looking at the uses around the Sprint Spectrum site, again, very similar in terms of the character of the roadways being rural in nature and there are subdivisions that have occurred along these roadways, frontage development, and there are also . . . what I would call planned subdivisions within the Sprint Spectrum area and that same condition exists around the Global Towers site."); 2087:1-5, April 12, 2010 ("Well, I think it was important to point out to the board and for the record that the geography, the conditions, the homes – it's very much a similar condition over, around the Sprint tower as it . . . is around the Singer property.").

42. Hence, both the proposed Tower and the Sprint Tower are in areas that are:

    (a)    rural in character;

    (b)    contain narrow roads;

    (c)    contain a mix of "frontage real estate developments, sporadic planned residential subdivisions, agricultural tracts, [and] wooded tracts; and

    (d)    are not densely populated.

See Decision at 82.

43. The Sprint Tower is located on a site that is approximately 784 feet in elevation, see Application Hr'g Tr. 234:19-235:1, June 17, 2009; Sprint Decision,

at 3, while the proposed Tower would be located on a site that is approximately 626 to 628 feet in elevation, see Application Hr'g Tr. 234:8-11, June 17, 2009; 1852:20-1853:3, Feb. 3, 2010; 2159:3-13, May 10, 2010.

44.     The Sprint Tower is located on a 50 by 50 foot leased area of a 10.81 acre tract.  See Application Hr'g Tr. 590:25-591:9, July 16, 2009; see also Sprint Decision, at 1.  The Leased Area for the proposed Tower is twice the size at 100 by 100 feet and is part of an approximately 30 acre parcel.  See Application Hr'g Tr. 590:25-591:9, July 16, 2009; supra ¶ 7.

45.     Like the proposed Tower, the Sprint Tower:

     (a)    has equipment cabinets;

     (b)    is a three-legged, lattice type tower;

     (c)    is fenced with a 7-foot high fence topped with barbed wire;

     (d)    is lighted;

     (e)    is unmanned and requires no water or sewer service;

     (f)    provides for future use by other tower companies; and

     (g)    is accessed by a private drive.

See Application Hr'g Tr. 591:10-592:5, July 16, 2009; Sprint Decision, at 3-5; see also supra ¶¶ 10, 13, 15, 17; infra ¶ 80.

46.   Like the proposed Tower, the Sprint Tower is visible above the treeline in various areas of the Township.   <u>See</u> Application Hr'g Tr. 2013:8-2017:14, Apr. 12, 2010.

47.   No landscaping or screening was proposed for the Sprint Tower because "there is no landscaping or screening that would buffer or screen a 250 foot tall tower." <u>See</u> Sprint Decision, at 9.

48.   Like the proposed Tower, the Sprint Tower's lease was for an initial 5 year term with a renewal option of four additional 5 year terms.   <u>See</u> PCS Site Agreement, dated Nov. 17, 1999, at 1, attached hereto as Exhibit "J"; <u>supra</u> ¶ 8.

49.   The Zoning Board granted Sprint Spectrum a variance to erect a 7-foot high fence topped with barbed wire because of the substantial economic value of the tower and its attractiveness to "juveniles, and/or others who may desire to climb the tower or attempt to enter the unmanned equipment shelter with its valuable electronic equipment." <u>See</u> Sprint Decision, at 13.

50.   The Zoning Board found no evidence that the Sprint Tower would "cause substantial injury to the value of other property" where it was proposed or "jeopardize the public health, safety, welfare or convenience." <u>See id.</u> at 9-10.

**2.   The Zoning Board Approved The Pennsylvania Cellular Tower.**

51.   The Pennsylvania Cellular Telephone Corp. Tower ("Pa Cellular Tower") is a lattice tower that is approximately 280 feet in height and is located in

on Haney Road in the center of the Township.  See Decision at 70; see also

Application Hr'g Tr. 269:14-19 (discussing Tower height), June 17, 2009; Pa

Cellular Decision, at 3.  It is on a leased tract of 150-feet by 150-feet in a parent

tract of 36 acres and is 2,775 feet from the nearest property line.  See Pa Cellular

Decision, at 3; see also Pa Cellular Notice of Land Use Appeal, at 2, attached

hereto as Exhibit "K."

52.    The Zoning Board approved the Pa Cellular Tower on November 6,

1996.  See Pa Cellular Decision, at 23-26.

53.    The Pa Cellular Tower is in a rural area of the A Zoning District,

which is the least intensive district in the Township.  See Application Hr'g Tr.

165:18-166:1, June 17, 2009; 2013:21-25, Apr. 12, 2010 ("So, the township

already has two towers within its boundaries that . . . I would classify as being in a

rural type setting and, specifically, a rural type setting similar to the Singer

property."); see also Zoning Ordinance, at Z-20.

54.    The Pa Cellular Tower is located on a site that is approximately 700

feet in elevation.  See Application Hr'g Tr. 269:25-270:8, June 17, 2009.

55.    The Pa Cellular Tower is in a wooded area and is screened by a 10

foot arborvitae.  No other landscaping or screening is provided, but the Zoning

Board concluded that the landscaping and screening requirements of the Zoning

Ordinance had been satisfied. See id. 1851:16-21, Feb. 3, 2010; Pa Cellular Decision at 11, 21.

56.    The Zoning Board granted Pa Cellular a variance to erect an 8-foot high fence topped with barbed wire because of the high economic value of the tower and its attractiveness to "juveniles and others who may desire to climb the tower or attempt to enter the unmanned equipment shelter with its valuable electronic equipment." See id. at 17-18.

57.    Like the proposed Tower, the Pa Cellular Tower:

     (a)    has equipment cabinets;

     (b)    is a three-legged, lattice type tower;

     (c)    is an unmanned facility that is not served by a water or sewer system;

     (d)    is accessed by a private, gravel drive;

     (e)    is fenced with an 8-foot high fence topped with barbed wire;

     (f)    is lighted;

     (g)    was approved by the FAA; and

     (h)    is gated.

See id. at 3-6, 20; see also supra ¶¶ 13, 15, 17; infra ¶ 80.

58.    The Zoning Board concluded that the Pa Cellular Tower "will not cause substantial injury to the value of other property where it is proposed" and

"does not jeopardize the public health, safety, welfare or convenience." <u>See</u> Decision on Pa Cellular Application, at 20-21.

**F.      The Tower Would Not Adversely Affect The Character Of The District Where It Is Located.**

59.    The Tower would not adversely affect the character of the district because:

(a)    the area in which the Tower is proposed to be placed is lightly populated, as are other areas of the Township; and

(b)    the Tower is much less intense of a use than the commercial and industrial uses that are permitted and/or currently in the C District.  Zoning Ordinance § 802.3(e); Application Hr'g Tr. 244:5-12, 251:20-252:1, 272:12-20, 287:13-24, 288:12-19, 289:19-22, June 17, 2009.

60.    The Tower satisfies all erosion and sediment control requirements set forth under Pennsylvania law and was approved by the Monroe County Conservation District.  <u>See</u> Letter dated May 7, 2010 from John Motz to Randy Hartmeyer, attached hereto as Exhibit "F"; <u>see also</u> Application Hr'g Tr. 2132:12-14, May 10, 2010; 2265:6-12, May 17, 2010.

**G.      The Board Placed The Burden Of Proof Of Valuation On Global.**

61.    The Board improperly placed the burden of proof of valuation on Global.  In the Decision, the Board stated:  "Accordingly, the Board is not persuaded that the Applicant satisfied its burden under Section 402.2 of the

Ordinance to prove that the Applicant's proposed cell tower will not cause substantial injury to the value of other property **where it is located** nor did the Applicant prove that the Applicant's proposed cell tower will conserve property values as required by Section 802.3 of the Ordinance." Decision at 62 (emphasis in original).

### H.    The Lease Was Not Intended To Create A New Lot.

62.    The Zoning Board concluded that the lease between the Singers and Global created a new lot and applied the zoning requirements for a new lot to the Tower. See id. at 55.

63.    However, the Singers never intended the lease to create a new lot because creation of a lot would trigger a rollback penalty under the real estate tax abatement program called Act 319 or the Farmland and Forest Land Assessment Act of 1974, in which the Singer Tract was enrolled. See id. at 51; see also Application Hr'g Tr. 1285:14-24 (discussing that any rollback taxes were the Singers' obligation and that they had no assets set aside for that purpose), 1286:10-13 (discussing Mr. Singer's understanding that the project would not trigger rollback penalties), Dec. 8, 2009.

64.    The Singers planned to avoid rollback taxes under Act 319 and to continue receiving its tax-abatement benefits even after leasing to Global. See generally Decision at 40.

65.    In addition, the lease was for a limited time (an initial 5 year term with 5 renewals of 5 years maximum), so the property would revert to the Singers' possession at the end of the lease, making the creation of a new lot useless. See id. at 51.

66.    The Zoning Ordinance's definition of "Erection of More Than One Principal Structure on a Lot" provides:  "In any district, more than one structure containing a permitted or permissable [sic] principal use may be erected on a single lot, provided that yard, lot area and other requirements of this Ordinance shall be met for each structure as though it were on an individual lot."   See Zoning Ordinance § 501.5, at Z-39 to Z-40.  Global's land planner witness (Chlebnikow) testified that the Section 501.5 yard and lot area requirements would be fully met for the proposed cell tower.  See Application Hr'g Tr. 126:9-15, June 1, 2009.  No testimony on the record contradicted this opinion.

## I.    The Tower Would Conform With All Regulations Applicable To The C Zoning District And Appropriate Public Uses.

67.    The Zoning Board found that the Tower complies with all height requirements in the Zoning Ordinance.  See Decision at 50-51.

68.    Vehicular and pedestrian traffic to and from the Tower will be minimal.  Zoning Ordinance § 802.3(f); Application Hr'g Tr. 851:6-7, Sept. 30, 2009 (Township's expert describing traffic issues as "de minimis" and "not applicable"); see also id. 124:11-15, June 1, 2009.

69.     As required by Section 402.2 of the Zoning Ordinance, the Tower provides "off-street parking and loading" so as to minimize interference with traffic on the local streets.  Zoning Ordinance § 402.2, Use Class 12, at Z-30; Application Hr'g Tr. 127:8-17, June 1, 2009; 259:19-260:2, June 17, 2009; 518:18-519:7, July 16, 2009; 826:22-24, Sept. 30, 2009.

70.     The fence requirement that purportedly applies to the Tower restricts fences on the **"front edge of any front yard"** from being greater than six feet in height.  Zoning Ordinance § 501.2 (emphasis added).

71.     However, the proposed fence "is not along the sides of the lot or the front edge of the front yard, it's some 400 feet from the road."  Application Hr'g Tr. 731:19-21, Aug. 24, 2009.  Nonetheless, the Zoning Board rejected Global's seven foot high chain link fence because it "exceeds the maximum six foot height of fences permitted by Section 501.2 of the [Zoning] Ordinance."  Decision at 72.

72.     Once a parking area is required for a **commercial or industrial use**, it must be paved.  Zoning Ordinance § 504.1(e), at Z-45.

73.     However, a telecommunications tower is an "Appropriate Public Use," not a commercial or industrial use, so the paving requirement does not apply. See Decision at 49.

**J.   The Tower Would Provide Adequate Landscaping And Screening To Protect Adjoining Areas.**

74.   Pursuant to Section 402.2 of the Zoning Ordinance, the Tower need only "provide necessary landscaping and/or screening to **protect adjoining areas.**" Zoning Ordinance § 402.2, Use Class 12 (emphasis added), at Z-30.

75.   Even the Township's engineering expert admitted that adequate screening does not mean that the entire Tower be blocked from visibility.   He stated:  "I'm not intending and I don't think the ordinance ever intended for somebody to try and screen a 300 foot tower." See Application Hr'g Tr. 832:7-9, Sept. 30, 2009.

76.   The Tower will be screened by dense trees that are 30 to 40 feet in height. See id. 124:16-125:8, June 1, 2009; 556:20-557:3, July 16, 2009.

77.   Nonetheless, the Zoning Board rejected Global's proposed screening and stated:  "The Board finds that the landscaping and screening proposed by the Applicant is inadequate and only screens the base of the tower.  The Board further finds that no screening is provided by the Applicant with respect to the fence and the equipment behind the fence." Decision at 86.

78.   The Singers agreed via letter dated May 10, 2010 not to remove trees within a contiguous buffer fifty feet in width on all sides of the proposed Tower. See id. at 73-74; see also Application Hr'g Tr. 2350:3-4, May 17, 2010.

79.     Mr. Singer also testified that he has no present intention of removing any trees from his entire property because none of the trees have any value as timber. See Application Hr'g Tr. 1334:22-25, Dec. 14, 2009.

### K.    The Tower Would Not Jeopardize The Public Health, Safety, Welfare, Or Convenience.

**1.    The Tower Would Not Jeopardize The Public Health, Safety, Welfare, Or Convenience.**

80.     The Tower design contains at least the following safety precautions:

(a)     the Tower will be illuminated for aviation safety as required by the Federal Aviation Administration;

(b)     the Tower and all accessory equipment will be grounded to protect from lightning strikes;

(c)     the site will be surrounded by a 7-foot high chain link fence;

(d)     no part of the Tower below the 20-foot height level is designed to assist or enable a person to climb the Tower;

(e)     all equipment cabinets will be locked at all times and will be designed to alarm if tampered with;

(f)     the Tower will contain no exposed electrical or telephone wires;

(g)     the Tower is designed to withstand wind speeds that are mandated by the latest and most stringent version of the International Building Code;

(h)    the Tower will meet all FCC requirements for energy emissions and/or power density;

(i)    the Tower provides an acceptable sight distance for the class of driveway proposed; and

(j)    access to the site will be prohibited using a 16-foot wide steel field gate with separate padlocks for each authorized user, including emergency services personnel.

See Decision at 72, 75, 78-79; see also Application Hr'g Tr. 196:15-17 (discussing exterior fence), 198:7-198:9 (discussing FAA compliance), 229:11-14 (discussing FCC compliance), June 17, 2009; 529:6-9 (discussing grounding of Tower), 534:8-9 (discussing the lack of vehicular access to the site), 535:4-10 (discussing anti-climb and locking features of Tower), 535:16-19 (discussing the lack of exposed electrical or telephone wires), 553:18-25 (discussing driveway site distance), July 16, 2009.

**2.    The Tower's Driveway Would Satisfy All Requirements.**

81.    As required by Section 402.2 of the Zoning Ordinance, the Tower provides "adequate access." Zoning Ordinance § 402.2, Use Class 12, at Z-30. First responders will be provided access to the Tower via keys or access codes to the locked gate at the end of the private driveway. If a worst case scenario arose, first responders would easily be able to use bolt cutters to access the property. See

Decision at 75-77; see also Application Hr'g Tr. 734:10-19, Aug. 24, 2009 (discussing emergency vehicle access).

82.    There is no evidence of record to suggest that the driveway would become impassable by emergency responders because of winter conditions. See Application Hr'g Tr. 736:20-737:14, Aug. 24, 2009.

83.    PennDOT has issued the required Highway Occupancy Permit for use of the driveway by Global. See id. 554:12-14, July 16, 2009.

84.    The Zoning Board applied Section 506.1(c) of the Zoning Ordinance to suggest that Global bears the burden to prove that the driveway is ideally located *if* future development occurs on the Singer property. See Decision at 77.

85.    Section 506.1(c) requires only "consideration" of "[t]he location and planning of driveway access points to permit their joint use by adjoining parcels so as to minimize the number of intersections with the street or highway." See Zoning Ordinance § 506.1(c), at Z-47.  Global is not proposing to increase the number of intersections with the highway because the drive is pre-existing, so this provision is inapposite. See Application Hr'g Tr. 185:6-23, June 17, 2009, 503:22-504:13, July 16, 2009.

### 3.    The Tower Would Provide A Sufficient Fall Zone.

86.    There is no danger that the Tower will fall on an adjacent property because there are no residences, businesses, uses, or other structures within a

distance from the Tower equal to its proposed height of 250-feet. <u>See</u> Decision at 73-74 (discussing Singer agreement); Application Hr'g Tr. 751:21-25, Aug. 24, 2009 (discussing distance from Tower to adjacent structures).

87.    Falling ice is also not a realistic concern because the Tower is more than 260 feet from the nearest property line and buffered by a zone of trees sufficient to capture any wind-blown ice. <u>See</u> <u>supra</u> ¶ 20 (discussing distance from nearest properties); Application Hr'g Tr. 745:19-24 (discussing tree buffer), Aug. 24, 2009.

## L.    <u>The Tower Would Not Cause Substantial Injury To The Value Of Other Property Where It Is Located.</u>

### 1.    **McKeown's Testimony Was Flawed.**

88.    The Zoning Board concluded from McKeown's testimony that the Tower would cause a diminution in property values. <u>See</u> Decision at 62, 86. However, the Zoning Board failed to consider the many flaws in McKeown's testimony. <u>See</u> <u>id.</u> at 18-22.

89.    To determine if the Tower would have an impact on property values, McKeown used a rent multiplier analysis approach, which predicts the income loss on a rental stream that would result from a particular condition, like the construction of a cell tower. <u>See generally</u> <u>id.</u> at 22; <u>see also</u> Application Hr'g Tr. 1064:24-1065:11, Nov. 9, 2009.

90.     The reduction in rental value of a property from a particular condition is multiplied by a gross rent multiplier, which is a ratio of the sales price or value of a *particular* home to its gross rental income. Application Hr'g Tr. 1072:16-21, 1074:16-23, Nov. 9, 2009.

91.     However, here, McKeown arrived at his gross rent multiplier by mixing rents from some "typical" properties with specific values from others. He did not determine the applicable rent multiplier by studying the rental rate of a *particular* property and then determining the fair market value of the same property. See id. 1923:23-1925:24, Mar. 11, 2010. This led to an inflation of his rent multiplier. Id.

92.     Moreover, McKeown did not inspect leases or rent rolls to verify the accuracy of his data. Instead, he used only "typical" rental values for properties in the Township, which he applied to the median home value in the Township. See id. 1072:22-1073:16; Nov. 9, 2009.

93.     McKeown failed to provide any evidence that any of the houses in sight of the Tower would or did rent for the "typical" amount. See, e.g., id., see also id. 1090:23-1091:13 (discussing "typical" rentals in *other* areas of the Township), Nov. 9, 2009; 1210:1-17 (same), Dec. 8, 2009.

94.    McKeown also failed to provide any evidence that any of the properties in sight of the Tower were rental properties. See id. 1925:6-14, Mar. 11, 2010.

95.    For his rent multiplier analysis, McKeown studied *only* four pairs of properties. Only one pair was within sight of a radio tower. The three other pairs were within sight of a highway, a water tank, and high voltage transmission lines. See id. 1081:16-1082:17 (discussing property pair in sight of high voltage transmission lines); 1082:22-1083:14 (discussing property pair in sight of water tower), 1084:13-1085:13 (discussing property pair in sight of highway), 1085:17-1086:18 (discussing property pair in sight of cell tower), Nov. 9, 2009. McKeown did not account for these differences. Id.

96.    The houses in McKeown's property pairs were dissimilar.  For example, the two properties that composed the pair in Saw Creek were significantly different in size and features. See id. 1921:20-1922:2, Mar. 11, 2010. McKeown's calculation did not account for this difference. Id.

97.    One member of the pair of properties that McKeown evaluated in Long Pond was near *both* a radio tower *and* a highway.  McKeown did not apportion the value difference between these two factors. Id. 1085:14-1086:18, Nov. 9, 2009; 1929:18-1930:25, Mar. 11, 2010.

98.   McKeown also offered no support for his position that the fears and concerns of the public *alone* would decrease property values around the Tower. See id. 1207:19-1208:1, Dec. 8, 2009.

99.   McKeown criticized Doyle's use of out-of-county data, but relied upon out-of-Township data.  McKeown offered no rationale for the distinction. See, e.g., id. 1079:4-1080:18 (discussing use of data from Stroud and Chestnuthill Townships), Nov. 9. 2009.

**2.   Doyle's Testimony Was Sound.**

100.   Doyle concluded that the Tower would not cause any diminution in property values.  See id. 357:11-358:9, June 30, 2009.

101.   Doyle's conclusion was based upon an extensive study of more than 100 sales in four carefully selected tower locations using a "paired sales analysis" method, which compares the value trends of similar residential properties either (a) before and after a tower is built or (b) within view and not within view of a tower. See id. 332:25-333:2, 333:11-25, 334:24-335:4, June 30, 2009.

102.   McKeown confirmed Doyle's conclusion that the "paired sales" method is the "most appropriate" method of appraising for external obsolescence, like the impact of a cell tower.  See id. 1066:6-10, Nov. 9, 2009.

103.   Doyle concluded that there was insufficient data in the Township or in Monroe County to do a reliable paired sales analysis.  See Decision at 19.

104.   McKeown agreed with Doyle's conclusion that there was insufficient data for a paired sales analysis in the Township or County. See Application Hr'g Tr. 1066:13-23, Nov. 9, 2009.

105.   As a result, Doyle studied four communities in eastern Pennsylvania that had similar "housing stock and buyers" to the Township. See Decision at 20; Application Hr'g Tr. 356:1-357:7, 380:20-24, June 30, 2009; see also id. 341:12-23 (discussing the "rural, agricultural" nature of the Berks County site); 342:23-343:1 (describing the Bucks County site as a "setting surrounded by agriculture"); 348:19-25 (describing the Chester County site's efforts at preserving its "green space"), June 30, 2009.

106.   Doyle assessed each of these four communities in comparison to Hamilton Township in terms of house values, census data, demographic profile, lot sizes, and surrounding land uses, finding them to be very similar and thus acceptable for study and comparison, except for the East Brandywine/Downingtown study area which was an area of higher real estate values. See id. 1915:15-1916:7, Mar. 11, 2010.

107.   Each of the studied communities was very close to a cell tower. See id. 336:10-16 (discussing the requirement that the Tower be in "[p]lain view" of the studied home), June 30, 2009.

108.   Nevertheless, the Board faulted Doyle because he did not conduct a study of the economic impact of existing towers in the Township.   The Board stated: "No credible explanation was proffered by Doyle why the impact of the Sprint Spectrum cell tower in Hamilton Township on surrounding property values could not have been analyzed both before and after that tower was erected to determine the impact of a similar tower on surrounding property values in an area similar to the Applicant's proposed cell tower." Decision at 61-62.

/s/ Elizabeth U. Witmer
George Asimos, Esquire
Elizabeth U. Witmer, Esquire
Jennifer L. Beidel, Esquire
Atty. I.D. Nos. 49275, 55808, 204450
gasimos@saul.com
ewitmer@saul.com
jbeidel@saul.com
SAUL EWING, LLP
Penn National Insurance Plaza
2 North 2nd Street, 7th Floor
Harrisburg, PA  17101-1619
Phone: (717) 257-7553
Fax:    (717) 257-7583

*Attorneys for Plaintiff Global Tower, LLC*

Dated:      September 15, 2011