**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**GLOBAL TOWER, LLC**                              **NO. 1:10-CV-1705**

**v.**                                                            **JUDGE CAPUTO**

**HAMILTON TWP. and**                            **MAGISTRATE JUDGE METHVIN**
**ZONING HEARING BOARD OF**
  **HAMILTON TWP**


**REPORT AND RECOMMENDATION**
**ON MOTIONS FOR SUMMARY JUDGMENT**
(**Docs. 19**, **22**)

This suit ensued after plaintiff's cell tower permit application was denied by

a local zoning board. Global Tower, LLC, alleges that the adverse decision by

Hamilton Township and its zoning hearing board (collectively, "Hamilton") was

not supported by substantial evidence as required by the Telecommunications Act

of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B)(iii) (2006).  Global also contends that

Hamilton unreasonably discriminated against it because providers of functionally

equivalent services were granted special use permits in similar situations. Global

further alleges a state law claim that the Hamilton Twp. Zoning Hearing Board

exceeded its legal authority by declaring, *sua sponte*, that the cell tower was a

"land development" requiring approval by another body.

2

Before the court are cross motions for summary judgment.[1] The motions have been referred to the undersigned for a report and recommendation and are now ripe for disposition.[2]

## FINDINGS AND RECOMMENDATIONS

### I. Background

Global is a limited liability company incorporated in Delaware with a principal place of business in Florida. (Docs. 20, 30 ¶ 1). Global is a company which leases real estate on which it constructs radio towers, which it then subleases to FCC-licensed personal wireless communications providers. (Docs. 23, 32 ¶ 1).[3] Hamilton Township is a political subdivision located in Monroe

---

[1] Hamilton filed a motion for summary judgment and a statement of facts on September 15, 2011 (Docs. 19, 20) and filed a supporting brief on September 29, 2011. (Doc. 27). Global filed a reply to the motion, an answer to the statement of facts and a brief in opposition on October 24, 2011 (Docs. 29, 30, 31). Global filed its own motion for summary judgment, statement of material facts and supporting brief on September 15, 2011 (Docs. 22, 23, 24), to which Hamilton filed an answer to the statement of facts on November 30, 2011. (Doc. 32). It does not appear that a brief in opposition to Global's motion has been filed.

[2] On December 16, 2011, Judge Caputo referred the present motions to the undersigned. (Doc. 36).

[3] A cell phone functions by transmitting information between its low-powered radio transmitter and a base station, usually a tower containing a large antenna. *See generally Pinney v. Nokia, Inc.*, 402 F.3d 430, 439–40 (4th Cir.2005). Each base station reaches a relatively small area, or cell, and as a user moves from cell to cell, the signal must transfer from base station to base station. *Id.* at 440. When cell phones communicate with base

(continued...)

3

County, Pennsylvania. (*Id*. at ¶ 2). The Hamilton Township Zoning Board is an instrumentality of the Township. (*Id*. at ¶ 3).

On December 16, 2008, Global, through one of its affiliates, entered into a lease agreement with Lloyd and Shirley Singer, as trustees of the Singer Trust. (*Id*. at ¶ 4). The Singers owned a 30-acre tract in Hamilton Twp., which is in a partially-developed rural area. (*Id*. at ¶¶ 5, 6). The Singer Tract includes a structure which has been described as barn, and has a gravel or dirt drive. (*Id*. at ¶ 6). The lease was for a term of five years, with five successive five-year renewal terms, for a total potential lease of 30 years. (*Id*. at ¶ 8). Global intended to construct a tower which it would then sublease to a personal wireless service provider. (Doc. 23, ¶ 9).

On February 17, 2009, Global[4] filed an application with the Hamilton Twp. Zoning Board requesting special use[5] approval to construct the tower. (Docs. 23,

---

[3](...continued)
stations, they emit RF energy. *Id*. The strength of a cell phone signal, and hence its range, has been positively correlated with the intensity of its RF emissions. *See In re Rural Telephone Cos.*, 18 F.C.C.R. 20802, 20829 & n. 114 (2003) [hereinafter NPR Rural ] (notice of proposed rulemaking)

[4] The original applicant was Fortune Wireless, which submitted the application of Global's behalf. *See* Doc. 20, n.1

[5] A special use, or special exception, "is a conditionally permitted use, allowed by the legislature if specifically listed standards are met." *In re Brickstone Realty Corp.*, 789

(continued...)

4

32 ¶ 10). Global subsequently amended its application on February 2, 2010 to reflect the proposed reduction in tower height from 300 feet to 250 feet. (*Id*. at ¶ 12).

The tower is to be a three-sided lattice-type construction, with clusters of antennae to be mounted in various locations on the tower, with a 7 foot lightening rod on top. (*Id*. at ¶ 13). The construction of the tower is to be in accordance with national and local codes, subject to review by the Hamilton Twp. code enforcement officer. (*Id*. at ¶ 14). The application further specifies that the tower will be unmanned and that it will not require water or sewer services, but only require underground telephone and electric lines. (*Id*. at ¶¶ 15, 16). Access to the tower is to be via the existing drive, with minor improvements made thereto. (*Id.* at ¶ 17). The landowner testified that he understood that, under the lease, Global would provide maintenance to the tower and surrounding areas. (*Id*. at ¶ 19).

---

[5](...continued)
A.2d 333, 340 (Pa. Commw. Ct.2001) (citing *Bray v. Zoning Board of Adjustment*, 48 Pa. Cmwlth. 523, 410 A.2d 909 (Pa. Commw. Ct.1980)). "Where a particular use is permitted in a zone by special exception, it is presumed that the local legislature has already considered that such use satisfies local concerns for the general health, safety, and welfare and that such use comports with the intent of the zoning ordinance." *Id*.

5

The parties dispute whether the proposed tower can be described as "distant" from neighboring properties, but agree the location can be described as follows:

> The Tower would be 361 feet from Pensyl Creek Road, 474 feet from the northern boundary of the Singer Tract; 326 feet from the eastern boundary of the Singer Tract, and 260 feet from the southern boundary of the Singer Tract.

(*Id*. at ¶ 20).

More importantly, the Singer Tract is located in a C Zoning District which, pursuant to §402.2 of the Hamilton Twp. Zoning Ordinance ("Ordinance"), permits radio and television transmission or receiving towers as a special use. (*Id*. at ¶ 22). Other permitted uses in C districts include, *inter alia*, multi-family residential buildings, commercial and limited commercial uses, light industrial uses and accessory uses and essential services. (*Id*. at ¶ 23). Section 402.2 also provides, *inter alia*, that a special use not cause injury to other property or jeopardize public health, safety, welfare or convenience. (Docs.20, 30 ¶ 9; Doc. 23-4, p. 31–32).

Twenty hearings on the Application were held between April 7, 2009 and June 10, 2010. (Docs. 23, 32 ¶ 27). The Board also conducted a view of the Singer Tract on March 17, 2010, during which Global conducted a balloon float to a

height of approximately 250 feet. (*Id*. at ¶ 28). Global offered the following testimony: Frank Chlebnikow, an expert on land use, zoning and community planning; John Doyle, a real estate appraiser; and Michael Bohlinger, a civil structural engineer. (*Id*. at ¶ 29). An objector to the proposed tower, Leopold Zappler, offered the testimony of Thomas McKeown, a real estate appraiser and R. Douglas Olmstead, Jr., P.E., a civil engineer. (*Id*. at ¶ 30). At the conclusion of the hearing, Global and the Singers agreed to the imposition of several conditions on the Application, in response to concerns raised during the hearing. (*Id*. at ¶ 31). The Board denied Global's Application for special use by a written decision on July 14, 2010. (*Id*. at ¶ 32).

Prior to ruling on Global's Application, the Board had approved the applications of two other radio towers, Sprint Spectrum and PA Cellular. (*Id*. at ¶ 33). The two towers had similar characteristics to the tower proposed by Global, although the PA Cellular tower was located in an A zoning district.[6] The applications for towers by both Sprint and PA Cellular were approved by the Board as special uses. (*Id*. at ¶ 35). The Sprint tower, whose special use application was approved on February 1, 2000, is (like Global's) a 250-foot lattice tower located in a C zoning district. (*Id*. at ¶¶ 37, 39, 40).

---

[6] The Sprint tower, like Global's, was in a C zoning district.

Global contends, and offered evidence, that both its tower and the Sprint tower are similar and are in primarily rural areas. (Doc. 23, ¶ 41). Additionally, the Sprint tower is located on a site approximately 784 feet in elevation, on a 50 x 50 foot leased area of a 10.81 acre tract. (*Id*. at ¶¶ 43, 44). The Global tower would be on a site approximately 626–628 feet in elevation, on a 100 X 100 foot leased tract on a 30 acre parcel. (*Id.*). In addition, the following characteristics are common to both towers: three-legged lattice design; equipment cabinets; 7-foot fencing topped with barbed wire; lighted; unmanned; provide for future use by other tower companies; and accessed by private drive. (*Id*. at ¶ 45).

As with the proposed tower, Sprint's tower is visible above the tree line in various areas of the Township. (*Id*. at ¶ 46). No landscaping or screening of Sprint's tower was proposed and the Board stated that "there [was] no such landscaping or screening that would buffer or screen a 250 foot tall tower." (*Id*. at ¶ 47). Sprint's lease term was for 5 years with 4 additional 5-year renewal terms. (*Id*. at ¶ 48). Given the perceived likelihood that the tower would present an attractive nuisance to those who may wish to climb the tower or attempt to enter the unmanned equipment shelter with its valuable electronic equipment, the Board found that special circumstances warranted approval of Sprint's request to erect a 7-foot fence topped with barbed wire, finding that it would both secure Sprint's

8

equipment and property as well as deter unauthorized entry on the site. (*Id*. at ¶ 49). Additionally, no evidence was presented that Sprint's proposed tower would cause substantial injury to the value of other property or that it would negatively impact the public health, safety or welfare. (*Id*. at ¶ 50; Docs. 20, 30 ¶ 170).

The PA Cellular tower was approved by the Board on November 6, 1996. (Docs. 23, 32 ¶ 52). It is lattice structure approximately 280 feet in height located in the center of the located on a 150 X 150 foot leased tract of 36 acres. (*Id*. at ¶¶ 52, 53). The PA Cellular tower is located in an A zoning district, an area which permits single and multi-family residences, agricultural and conservational uses. (*Id*. at ¶ 53; Doc. 23-4, p. 23). It is on a site approximately 700 feet in elevation, in a heavily-wooded area providing natural landscaping and screening. (*Id*. at ¶¶ 54, 55). Like the Sprint tower, the Board found that "no landscaping or screening would buffer or screen a 280 foot tall tower. (Docs. 32, ¶ 55).[7] Additionally, PA Cellular sought, and was granted, a variance to erect an 8 foot fence topped with barbed wire around the tower site, given its attractiveness to "juveniles and others who may wish to climb the tower or attempt to enter the unmanned equipment

---

[7] Hamilton points out that the existing trees proposed as landscaping and screening for Global's tower are outside of the leased area on the Singer tract, which could be removed by the landowner in the absence of any contractual or other controls or restrictions. (Doc. 32, ¶ 55).

shelter" containing "valuable electronic equipment." (Docs. 23, 32 ¶ 56). As with the Global proposal and the Sprint tower, the PA Cellular tower: is a three-legged lattice design; has equipment cabinets; is lighted and unmanned; is accessed by private drive; and is gated. (*Id*. at ¶ 57). Based on the applicant's uncontroverted testimony, the Board concluded that he PA Cellular tower would not substantially impact property values nor negatively affect public health, safety, welfare or convenience. (*Id*. at ¶ 58).[8]

As with the Sprint and PA Cellular towers, the Board concluded that Global's proposed lease area constituted a new "lot." (*Id*. at ¶ 62).[9] Section 501.5 of the Ordinance also allowed that "more than one structure containing a permitted . . . use . . . [could] be erected on a single lot, provided that the yard, lot area and other requirements . . . [are] met for each structure as though it were on an individual lot." (*Id*. at ¶ 66). Consistent with the interpretation of this section for the Sprint and PA Cellular towers, the Board concluded Global's proposed tower was exempt from the height requirements of the Ordinance. (*Id*. at ¶ 67).

---

[8] Opponents did not present testimony from a real estate appraiser or other witness to contradict's the applicant's testimony. (Doc. 32, ¶ 58).

[9] Global contends that the Singers did not intend the lease to create a new lot because it would trigger a rollback penalty under a real estate tax abatement program known as Act 319. (Doc. 23, ¶¶ 63, 64).

Section 501.2 of the Ordinance provides that "no open or mesh fence along the sides or front edge of any front yard shall be greater than six feet in height." (*Id*. at ¶ 71). Global submits that the proposed fence is not "along the sides of the lot or the front edge of the front yard" but rather some 400 feet from the road. (Doc. 23, ¶ 71). Hamilton contends that, having concluded that the leased area constitutes a "lot," it was governed by §501.2 and, further, that Global did not apply for a variance to erect of fence greater than six feet. (Doc. 32, ¶ 71). Although the Ordinance provides that industrial and commercial uses must pave parking areas and access, Global contends that, because a telecommunications tower is an appropriate "public" use, it is not required to pave the access drive nor any parking area. (Docs. 23, 32 ¶ 72; Doc. 23-4, p. 48 (Ordinance §504.1 (e)).

Section 402.2 of the Ordinance provides that landscaping and screening be provided to protect adjoining areas. (*Id*. at ¶ 74; Doc. 23-4, p. 33 (Ordinance §402.2, Use Class 12 (d))). The Township's engineering expert testified that adequate screening does not mean that an entire structure is blocked from view and further stated that he did not believe the Ordinance was intended to screen a 300 foot tower. (*Id*. at ¶ 75). Global's proposed tower would be screened by trees 30–40 feet in height. (*Id*. at ¶ 76). The Board, however, rejected Global's proposed screening, finding that it was inadequate and screened only the base of the tower,

and did not screen the fence or the equipment behind the fence. (*Id*. at ¶ 77). More specifically, the Board concluded that the landscaping was based on trees outside the leased area as there was no vegetation within the leased area and, in absence of contractual or other restrictions, the landowner could remove the existing vegetation outside of the leased area. (Doc. 32, ¶ 77). In response to this concern, the Singers agreed, via letter dated May 10, 2010, not to remove and trees within a contiguous buffer of 50 feet on all sides of the proposed tower. (*Id*. at ¶ 78). The Board found that the stipulation offered was materially less than the 100 foot area Bohlinger testified was indicated and/or necessary. (Doc. 32, ¶ 78).

The proposed tower would have the following safety precautions: illumination for aviation safety; it and all accessory equipment would be grounded to protect from lightening strikes; it would be surrounded by a 7-foot fence; no part of the tower below 20 feet enables a person to climb it; all equipment cabinets will be locked with alarms; it will have no exposed electrical or telephone wires; it is designed to withstand wind speeds mandates by the International Building Code; it will meet all FCC requirements for energy emissions and/or power density; it provides an acceptable sight distance for the class of driveway proposed; site access will be restricted with a 16-foot wide steel field gate. (*Id*. at ¶ 80).

12

Global also proposed providing emergency service personnel access through the gate. (Docs. 23, ¶¶ 80(j), 81). Hamilton contends, however, that Global did not establish such access by emergency service providers was adequate or feasible. (Doc. 32, ¶ 81). Further, Bohlinger testified that Global's failure to plow, salt or cinder the driveway would make the leased area inaccessible to emergency service personnel in conditions of moderate to heavy snow or ice. (*Id*. at ¶ 82).

Section 506.1 (c) of the Ordinance states that, when a parcel is being developed adjacent to another parcel used or suitable for non-residential development, consideration is to be given to "the location and planning of driveway access points to permit their joint use by adjoining parcels so as to minimize the number of intersections with the street or highway[.]" Ordinance, § 506.1 (c)(1).

Global also offered evidence that there were no structures within a distance of the proposed tower equal to its height. (Docs. 23, 32, ¶ 86). However, the Board found that the leased area was less than the area required for a safety zone to permit for windblown and falling ice. (Doc. 32, ¶ 86). Specifically, Bohlinger testified that in any failure affecting the entire tower, the fall zone would be

approximately 100 X 100 feet. (Doc. 20, 30 ¶ 76). This is an area outside of the

leased area but within the boundaries of the Singer property. (Doc. 30, ¶ 76).

Based on the testimony of McKeown, the Board concluded that the

proposed tower would cause a diminution in property values. (Docs. 23, 32, ¶ 88).

In reaching this conclusion, McKeown used a rent multiplier analysis approach,

which predicts income loss on a rental stream that would result from a particular

condition, like the construction of a cell tower. (*Id*. at ¶ 89). Under this analysis, a

reduction in rental value is multiplied by a gross rent multiplier, which is the ratio

between the sales price and the gross rental income. (*Id*. at ¶ 90). McKeown did

not inspect leases or reference rent rolls to verify his figures but instead used a

range of average rentals in Hamilton Twp. based on his business involvement in

real estate matters there for ten years. (Docs, 23, 32 ¶ 92).

Doyle stated that McKeown arrived at his gross rent multiplier by

comparing rents from typical properties with specific values from others. (Doc. 23,

¶ 91). Doyle also took issue with other aspects of McKeown's findings: that he

failed to provide evidence that any of the houses within sight of the tower would

or did rent for "typical" amounts; he failed to offer evidence that any properties

within sight of the tower were rental properties; the fact that he used only four

pairs of properties in his rent multiplier analysis, only one pair of which were in

14

sight of a radio tower; the houses were dissimilar; and that there was no support

for McKeown's position that fears and concerns of the public alone would

decrease the property values around the tower. (Doc. 23, ¶¶ 93–96, 98).

Doyle testified that the tower would not cause a diminution in value. (Docs.

23, 32 ¶ 100). Doyle used the "paired sales analysis" to conduct his study and

reach his conclusion. This method compares the value trends of similar residential

properties either (a) before and after the tower is built or (b) within view or not

within view of the tower. (Docs. 23, ¶ 101). However, in analyzing such

information, Doyle used cell tower locations in Berks, Bucks, Chester and

Montgomery Counties, which are removed from Hamilton Twp. and Monroe

County. (Doc. 32, ¶ 101). McKeown agreed that, according to the Appraisal

Institute,[10] the paired sales analysis is the most appropriate method for appraising

external obsolescence, such as a cell tower, if there is sufficient market data. (*Id*. at

¶ 102). McKeown opined that, based in insufficient market data in Hamilton Twp.

or Monroe County, the income approach was the most appropriate method to

determine value.  (*Id*. at ¶ 104). Both Doyle and McKeown agreed, however, that

---

[10] The Appraisal Institute is a global membership association of professional real estate appraisers. (Doc. 32, ¶ 102).

there was insufficient data in Hamilton Twp. or Monroe County to do a reliable paired sales analysis. (*Id*. at ¶ 103).[11]

Because of the lack of data, Doyle testified that he studied four communities in eastern Pennsylvania that had similar housing stock and buyers to Hamilton Twp. (*Id*. a ¶ 105).[12] Each of the communities Doyle studied was very close to a cell tower. (*Id*. at ¶ 107). However, the Board faulted Doyle's analysis and conclusions because he failed to explain why the impact of the Sprint tower on surrounding property values both before and after it was erected could not have been analyzed to determine the impact of a similar tower, such as Global's, on values in properties surrounding it. (*Id*. at ¶ 108).

The Board's July 14, 2010 decision reflects the following findings: the leased area was a "lot" and thus was required to comply with minimum lot size for a C zoning district. (*See* Doc. 23-4, p. 24 (Ordinance, Sch. II)); Docs. 20, 30 ¶

---

[11] Despite the lack of data available, the Board nonetheless faulted Doyle's study for this reason. (*See* Doc. 1, Ex A-2, p. 60).

[12] Doyle testified that he specifically assessed the four communities to Hamilton Twp. In terms of house values, census data, demographic profile, lot size, surrounding land uses, finding them to be very similar, and thus acceptable, for study and comparison, with the exception of the East Brandywine/Downingtown area, which had higher real estate values. (Doc. 23, ¶ 106).

16

139).[13] With respect to Global's special use application, the Board took issue with

the fact that several elements fell outside of the leased area: trees for screening, a

part of the storm water basin, the entrance to the driveway, and the ice fall zone

and tower fall zone.[14] The Board also expressed concern about access to the leased

area by emergency service providers, given that Global intended to have a locked

gate, but Global indicated that such entities would be give access with keys.

(Docs. 20, 30 ¶ 147). Further, the Board cited Bohlinger's testimony that the

driveway is not presently plowed. (Doc. 20, ¶ 148). There is no indication,

however, that this practice would continue if the tower were built. (Doc. 30, ¶ 66).

The Board also found that the Application did not comply with 506.1(c),

which provides:

> [W]here a parcel is being developed adjacent to another parcel used
> or suitable for nonresidential development, consideration should be
> given to . . . the location and planning of driveway access points . . .
> so as to minimize the number of intersections with the street or
> highway[.]

(Doc. 23-4, p. 51). However, Global contends that, inasmuch as the driveway

already exists, section 506.1 (c)'s concerns are not implicated and it is thus

---

[13] *To wit.*, 1 acre in size; 150 feet minimum in width and in depth; 40 feet minimum front
yard set back; and 20 feet minimum rear and each side yard set back.

[14] However, it does not appear that the Ordinance requires these factors must be within
the leased area.

inapplicable. (Doc. 30, ¶¶ 151, 152). Finding that there was a potential threat to the health, safety and welfare of persons and/or structures on the Singer property, outside of the leased area, despite the fact that the Singer tract was virtually empty in that it had only one structure—referenced as a barn—and otherwise appears to be uninhabited, the Board determined that increasing the leased area to 1 acre was appropriate under Schedule II. (Docs. 20, 30 ¶ 157).

Concluding that Global had failed to satisfy its burden of proving that its tower would not cause substantial impact to the value of other property where it is to be located, the Board denied Global's application. (*Id*. at ¶ 158). The present action followed.

## II. Issues Presented

Hamilton argues it is entitled to summary judgment as follows:

1. Substantial evidence supports the Zoning Board's determination that Global failed to satisfy its burden regarding the Township's ordinance requirements for special use.

2. Global has failed to demonstrate that Hamilton unreasonably discriminated against it by denying its application for special use.

Conversely, Global seeks summary judgment on the following grounds:

1. The Zoning Board's rejection of Global's application, after approving two nearly identical towers under the identical "Appropriate Public Use" standard, constitutes unreasonable discrimination in violation of the TCA

2.      The Zoning Board's decision violates the TCA because it is not
        supported by substantial evidence.

3.      Global is entitled to summary judgment because the Zoning Board
        violated state law.

## III. Standard of Review

Under Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

19

When determining whether there is a genuine dispute of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid or obtain summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed. R. Civ. P. 56(c)(1); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir.

20

1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed. R. Civ. P. 56(e).

Standards for resolving motions for summary judgment do not change when the parties file cross-motions. *Benckini v. Hawk*, 654 F. Supp.2d 310, 315 (E.D. Pa.2009). Although a court may consider cross-motions for summary judgment concurrently, it must resolve the motions independently. *Williams v. Phila. Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa.1993). The fact that both parties have moved for summary judgment "does not mean that the case will necessarily be resolved at the summary judgment stage," *Atlantic Used Auto Parts v. City of Philadelphia*, 957 F. Supp. 622, 626 (E.D. Pa.1997), or that either party has waived its right to have the case presented to a jury. *Facenda v. N.F.L Films*, 542 F.3d 1007, 1023 (3d Cir.2008).

**IV. Discussion**

*(A) Telecommunications Act*

Prior to 1996, federal courts took "an extremely deferential stance in reviewing local zoning decisions, limiting the scope of inquiry to the constitutionality of the zoning decision under a standard of rational review."

*Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir.1999) (citing

*Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68, 101 S.Ct. 2176, 68 L.Ed.2d

671 (1981)). However, the TCA altered that traditional deference in very

important ways insofar as local decisions interfere with, or impact upon,

telecommunications facilities. *Ogden Fire Co. No. 1 v. Upper Chichester Twp.*,

504 F.3d 370, 379 (3d Cir. 2007). The TCA represents an attempt to balance the

competing interests of the national government's policy of enhancing competition

in the telecommunications industry and the local government's ability to regulate

land use. *Liberty Towers, LLC v. Zoning Hearing Bd. of Falls Twp.*, Civ. A. No.:

10-7149, 2011 WL 6091081 (E.D. Pa. Dec. 6, 2011). Congress enacted the TCA

to provide "'a pro-competitive, de-regulatory national policy framework designed

to rapidly accelerate private sector deployment of advanced telecommunications

and information technologies and services to all Americans by opening all

telecommunications markets to competition.'" *APT Pittsburgh Ltd. P'ship v. Penn

Twp.*, 196 F.3d 469, 473 (3d Cir.1999) (quoting H.R. Conf. Rep. No. 104–458

(1996), reprinted in 1996 U.S.C.C.A.N. 10, 1124)). To that end, Congress set out

to reduce "the impediments imposed by local governments upon the installation of

facilities for wireless communication, such as antenna towers." *City of Rancho

Palos Verdes v. Abrams*, 544 U.S. 113, 115, 125 S.Ct. 1453, 161 L.Ed.2d 316

(2005). The Act limits "the ability of local authorities to regulate and control the expansion of telecommunications technologies" by allowing courts to "review telecommunication zoning denials more closely than standard zoning decisions." *Omnipoint Communications Enterprises, L.P. v. Newtown Twp.*, 219 F.3d 240, 242–43 (3d Cir. 2000). Local zoning authorities, however, retain a considerable amount of power under the Act. Section 332(c)(7)(A) provides that:

> Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

47 U.S.C. § 332(c)(7)(A). Any person adversely affected by local regulators' final action on a placement, construction, or modification application may seek judicial review in any court of competent jurisdiction. *See id*. § 332(c)(7)(B)(v).

In the present case, Global argues that the Board's denial of its application violates the TCA because it was not based on substantial evidence, was arbitrary and capricious and an abuse of discretion, and thus constitutes a violation of § 332 (c)(7)(B)(i)(iii) of the Act. Hamilton, on the other hand, maintains that there is substantial evidence to support the Board's decision and that Global has failed to show that the Board unfairly discriminated against it.

*(B) Is there substantial evidence to support the zoning board decision?*

The first issue to be addressed is whether the Board's decision was supported by "substantial evidence" contained in a written record as required by the Act. 47 U.S.C. § 332(c)(7)(B)(iii). "The TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements." *Omnipoint Communications MB Operations, LLC v. Town of Lincoln*, 107 F. Supp.2d 108, 115 (D. Mass. 2000). "Congress intended that the substantial evidence requirement of the TCA be equivalent to 'the traditional standard used for judicial review of agency actions.'" *Cellco P'shp. v. Hess*, No. Civ. A. 98-3985, 1999 WL 178364, *5 (E.D. Pa. Mar. 30, 1999) (citing *Bellsouth Mobility Inc. v. Gwinnett County*, 944 F. Supp. 923, 928 (N.D. Ga.1996). "The test is fairly deferential to the opinion of the zoning authority and a reviewing court is not free to substitute its own judgment for that of the local authority, even if the reviewing court would have decided the issue differently as an original matter." *Omnipoint Communications*, 107 F. Supp.2d at 115. (citations omitted).

Substantial evidence is more than a mere scintilla; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp.2d 875,

878 (E.D. Pa. 1998),  *aff'd*, 181 F.3d 403 (3d Cir. 1999) (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1952)). *See Alexander v. Shalala*, 927 F. Supp. 785, 791 (D.N.J.1995) (defining substantial evidence as "more than a mere scintilla, but may be less than a preponderance") (citation omitted), *aff'd*, 85 F.3d 611 (3d Cir.1996). *See also Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988) (noting that a "large or considerable amount of evidence" is not required).

In applying the substantial evidence standard, a court must consider the zoning board's hearing record in its entirety, including contrary evidence. *Penobscot Air Servs. v. FAA*, 164 F.3d 713, 718 (1st Cir.1999) "However, the possibility of drawing two inconsistent conclusions does not mean that the zoning authority's decision is not supported by substantial evidence[.]" *Omnipoint Communications*, 107 F. Supp.2d at 115 (citing *Penobscot Air*, 164 F.3d at 718). The relevant inquiry under the substantial evidence standard is "whether a zoning authority's denial is based on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' or whether it is based upon unsubstantiated conclusions.'" *Omnipoint Communications*, 107 F. Supp.2d at 115 (quoting *Cellular Tel. Co.,* 166 F.3d at 494).

25

Applying this standard to the facts of the case at bar, the undersigned concludes that reasonable minds could not find substantial evidence to support the Board's denial of Global's Application.

As Global notes, the burden of proof is on the Board to establish that its decision was based on substantial evidence. If conflicting evidence exists, the Board must explain its reasons for rejecting the other evidence presented.

Under Pennsylvania law, special uses are presumptively permitted if certain conditions or standards are met. *Omnipoint Corp.*, 20 F. Supp. 2d at 879 (citing *Johnson v. North Strabane Township*, 119 Pa. Cmwlth. 260, 546 A.2d 1334, 1334 n. 1 (Pa. Commw. Ct. 1988) (noting that, under Pennsylvania law, a special exception is not an exception to a zoning ordinance, but rather a use which is expressly and presumptively permitted). Accordingly, any objectors to a special use application bear the burden of showing, with a high degree of probability, that the proposed use will substantially affect the health, safety and welfare of the public in a negative manner. *Id.*[15] Mere speculation or possibility of such an effect,

---

[15] A zoning ordinance may, however, place the burden of proof on the applicant to show that the proposed project is not a detriment to the health, safety and general welfare of the neighborhood. *See Manor Healthcare Corp. v. Lower Moreland Township Zoning Hearing Bd.*, 139 Pa. Cmwlth. 206, 590 A.2d 65, 70 (Pa. Commw. Ct. 1991). Courts have held, however, that such an ordinance "places only the persuasion burden on the applicant because ... the objector retains the evidence presentation duty as to such matters." *Bray v.*

(continued...)

or personal opinions thereon, are insufficient to carry this burden of proof. *Id*.

Additionally, "[g]eneralized concerns and conclusive statements within the record

about the aesthetic and visual impacts on the neighborhood do not amount to

substantial evidence." *Omnipoint Corp.,* 20 F. Supp. 2d at 880 (citations

omitted).[16]

In rejecting Global's special use application, the Board relied upon evidence

that the cell tower would have an adverse impact on property values. The parties

dispute whether Global or the objectors had the burden of proof on this issue. The

Board contends that this is one of the ordinance's objective criteria for the special

use which the applicant must satisfy. Global contends that under state law,

objectors have the burden of showing that a special use permit would be

detrimental to public health, safety and welfare.

---

[15](...continued)
*Zoning Bd. of Adjustment*, 48 Pa. Cmwlth. 523, 410 A.2d 909, 912 (Pa. Commw. Ct. 1980); *see also Manor*, 590 A.2d at 70; *Kern v. Zoning Hearing Bd. of Township of Tredyffrin*, 68 Pa. Cmwlth. 396, 449 A.2d 781, 783 (Pa. Commw. Ct. 1982). Thus, under such ordinances, objectors still retain the initial presentation burden with respect to the detrimental effect of the project on the character, property values, health and safety of the neighborhood and its residents. Nonetheless, the Hamilton Twp.'s Zoning Ordinance does not specifically place the burden of proof on a special use applicant.

[16] For this reason, the testimony of Jeffrey Desind, Daniel Cohen, Jack and Joanne Fossett and Sandra Holly Wilkinson, all of whom have property located near the proposed tower or within sight of it, is of little value. As these individuals testified that, in their personal opinion, the tower would negatively impact their properties, it is not sufficient evidence on which to base a denial of the application.

A review of the case law shows that, as argued by Global, special uses are

presumptively permitted, and the burden of proof to show otherwise falls on the

objectors. *See Bailey v. Upper Southampton Twp.*, 690 A.2d 1324, 1326 (Pa.

Commw. Ct. 1997) (where a zoning ordinance is silent on the point, the burden of

proving that a conditional use application is inconsistent with the criteria

established by the zoning ordinance lies with the objectors); *Abbey v. Zoning*

*Hearing Bd. of Borough of East Stroudsburg,* 126 Pa. Cmwlth. 235, 241, 559 A.2d

107, 110 (Pa. Commw. Ct. 1989) (a special exception permit is a conditionally

permitted use and therefore applicant need only carry the burden of persuasion as

to the specific criteria of the ordinance; objectors have the burden of showing that

the proposal is detrimental to the public health, safety and welfare); *Bray v.*

*Zoning Bd. of Adjustment*, 48 Pa. Cmwlth. 523, 410 A.2d 909, 911 (Pa. Commw.

Ct. 1980) ("Pennsylvania decisions have placed on the objectors the burden of

showing the proposal to be detrimental to public health, safety and welfare.");

*Ogden*, 504 F.3d at 382 (once applicant has complied with the ordinance, "burden

then shifts to objectors to prove that the proposed use is not, in fact, consistent

with the promotion of health, safety, and general welfare."). *See also Omnipoint*

*Corp., supra.*[17]

   As noted above, McKeown testified that property values around the

proposed tower would be affected by a decline of at least $10,000.00. Hamilton

contends that this testimony provided substantial evidence for denial of the special

use under Section 302.3(e) of the Ordinance, which states:

> (e)   Such [special] use shall not adversely affect the character of the
> district, *nor the conservation of property values* nor the health
> and safety of the residents or workers on adjacent properties
> and in the general neighborhood.

(Doc. 23-5, p. 62)(emphasis supplied). However, "[n]either aesthetic reasons nor

the conservation of property values nor the stabilization of economic values in a

township are, singly, or combined, sufficient to promote the health or the morals

or the safety of the general welfare of the township." *Soble Construction Co. v.*

*Zoning Hearing Board of the Borough of East Stroudsburg*, 16 Pa. Cmwlth. 599,

329 A.2d 912, 917 (Pa. Commw. Ct.1974) (citations omitted); *see also A. J.*

---

[17] Such a position is consistent with the Board's earlier decision approving Sprint's
application for a tower, where no evidence was presented that Sprint's proposed tower
would cause substantial injury to the value of other property or that it would negatively
impact the public health, safety or welfare. (Docs. 23, 32 ¶ 50; Docs. 20, 30 ¶ 170). If
such factors were objective requirements which the applicant has the burden of proving, it
is difficult to see why an earlier applicant, who presented no evidence on this point,
nonetheless received approval without establishing an objective criteria was met.

29

*Grosek & Associates v. Zoning Hearing Bd. of Montrose*, 69 Pa. Cmwlth. 38,

43–44, 450 A.2d 263, 266 (Pa. Commw. Ct. 1982) ("Parties in opposition to a

special exception cannot sustain their burden of proving that the use proposed for

the exception will be injurious to the public's health, safety, or welfare by 'merely

introducing evidence to the effect that property values in the neighborhood may

decrease.'"). Accordingly, any alleged diminution in monetary or aesthetic values

of properties near or in sight of Global's proposed tower, without more, cannot

support the denial of a special use application such as Global's.

Moreover, given that the Legislature has concluded that, under normal

circumstances, the impact of a special use itself does not adversely affect the

public interest in any material way, objectors to a special use must demonstrate not

only that the adverse effect resulting from the proposed use is abnormal but also

that it has a high probability of occurring. *See Omnipoint Corp.*, 20 F. Supp. 2d at

880 (finding denial os special use application erroneous because the objectors

failed to establish their objections with a sufficiently high degree of probability).

This would require a demonstration both that the proposed tower's impact on

property values or the public health, safety and welfare were quite different from

any other permitted use being developed at that site and that such an aberrant

effect would have a high likelihood of occurring. Such a showing has not been made by the objectors. As Global points out, there is no evidence of record that the alleged negative impact objectors have associated with its tower differs from the impact correlated with other uses allowed within the C zoning district, such as a multi-family residential use, commercial use or industrial use. Objectors did not show that estimated adverse impact on property values is outside the range of the normal effects that would accompany the other permitted uses in that district and, further, that such an abnormal impact has a high likelihood of occurring.[18] The burden to establish this effect, along with its high probability, rests with the objectors. Inasmuch as this burden was not carried, the Board erred in denying Global's application for special use.

Global compared the specific factors of the two approved cell towers with its own proposed tower with respect to their common structure, placement and impact. Objectors failed to rebut this objective showing with non-subjective evidence. Instead, the testimony offered regarding the diminution is property values was based, in part, on an assumption that no one wished to purchase

---

[18] Given that the expert real estate testimony offered established that property values in at least one location had risen even though they were near or in sight of a radio tower undermines the argument that there is a high probability that of property values in Hamilton Twp. would diminish if the tower were approved.

property near or in sight of a radio tower.  (Dec. 8, 2009 Hrg. Tr., 1206:19–1207:1).

Based on this analysis, it is therefore concluded that the Board's conclusion was not supported by substantial evidence. Consequently, summary judgment is warranted in Global's favor on this issue.[19]

*(C) Discrimination under the TCA*

The TCA requires that the "regulation of the placement, construction, and modification of personal wireless service facilities by [local governments] ... shall not unreasonably discriminate among providers of functionally equivalent services." 47 U.S.C. § 332(c)(7)(B)(i). The purpose of the TCA's prohibition against unreasonable discrimination is to ensure that once the municipality allows the first wireless provider to enter, the municipality may not unreasonably exclude subsequent providers who similarly wish to enter and create a competitive market in telecommunications services. *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board*, 331 F.3d 386, 395 (3d Cir. 2003) (citing *Nextel West Corp. v. Unity Twp.,* 282 F.3d 257, 264 n. 6 (3d Cir. 2002).

---

[19] In reaching this conclusion, the weight or credibility of the real estate appraisers, Doyle and McKeown, need not be assessed. Rather, the determination is based on what evidence was, or was not, offered.

A two-prong test emerges from this provision. *See APT Pittsburgh Ltd.*
*P'ship v. Lower Yoder Township*, 111 F. Supp.2d 664, 674–75 (W.D. Pa.2000).
The first prong inquires whether the relevant providers are "functionally
equivalent." 47 U.S.C. § 332(c)(7)(B)(i). If they are, then the second prong asks
whether the governmental body "unreasonably discriminate[d] among providers."
*Id*. The TCA does not prohibit all discrimination against providers, only
unreasonable discrimination. *See AT&T Wireless PCS v. Virginia Beach*, 155 F.3d
423, 427 (4th Cir.1998). *See also Nextel West Corp., supra* ("To preserve the
ability of local governments and zoning boards to take into account the uniqueness
of land, the TCA 'explicitly contemplates that some discrimination ... is allowed.
Any discrimination need only be reasonable.'" (quoting *AT & T Wireless PCS,*
*supra a*(4th Cir.1998)); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 638 (2d
Cir.1999).

Relief under the TCA's discrimination provision requires "a showing that
the other provider is similarly situated, i.e., that the 'structure, placement or
cumulative impact' of the existing facilities makes them as [intrusive] or more
intrusive than the proposed facility." *APT Pittsburgh*, 196 F.3d at 480 n. 8.
Discrimination may be impermissible where a municipality favors one provider by
permitting it to locate in a particular area at the exclusion of others, thereby

creating unfair competitive advantage. *See Western PCS II, Corp. v. Extraterritorial Zoning Auth.*, 957 F. Supp. 1230, 1237–38 (D.N.M.1997). A plaintiff carries the burden of establishing both prongs of its unreasonable discrimination claim. *Omnipoint Comm.*, 331 F.3d at 395.

### (1) Functionally equivalent services

The equivalency of function relates to "the telecommunications services the entity provides rather than to the technical particularities (design, technology or frequency) of its operations." *Nextel* at 267, n. 13. Global contends that its tower is functionally equivalent to the Sprint and PA Cellular towers, which are "radio towers with attached radio antennas equipment used to provide . . . PCS services marketed to the . . . public" under FCC licenses. (Doc. 24, p. 15).

Hamilton states that the providers are not functionally equivalent because the applications of the two existing towers were conditionally granted and, had it been approved, Global's application would be similarly conditioned. However, Hamilton misconstrues this factor inasmuch as functional equivalency reflects the services provided, not the technical aspects of such operations or what stipulations are required to obtain zoning approval. *See Ogden*, 504 F.3d at 392. By focusing on the evidence offered in approving the applications of the other two towers, rather than the services provided by the three entities, Hamilton fails to address the

relevant inquiry of this prong and, thus does not refute Global's argument that the three are functionally equivalent.

Finding that the services provided by Global are functionally equivalent to those whose applications it has approved, the first prong of an unreasonable discrimination claim has been established. Global is functionally equivalent to the two previously-approved providers, Sprint and PA Cellular.

*(2) Did the Board discriminate among providers?*

As noted above, the  second prong of the unreasonable discrimination test can be satisfied "by demonstrating that the structure, placement or cumulative impact of the existing [] facility makes it more intrusive than the proposed [] tower." *Ogden*, 504 F. 3d at 393 (quoting *Ogden I*, 2006 WL 851391 at *8); *USCOC of New Hampshire RSA #2, Inc. v. City of Franklin, N.H.*, No.: 05-CV-266, 2007 WL 43336, *2 (D.N.H. Feb. 6, 2007) (for a plaintiff to prevail with respect to this second factor, it must demonstrate there is no genuine issue of material fact regarding whether its proposed facility is "similarly situated" to other towers in terms of "structure, placement and cumulative impact.") (quoting *MetroPCS, Inc. v. City of San Francisco,* 400 F.3d 715, 727 (9th Cir.2005)). "[T]he phrase 'unreasonably discriminate among providers of functionally equivalent services' [provides] localities with the flexibility to treat facilities that

create different visual, aesthetic, or safety concerns differently to the extent

permitted under generally applicable zoning requirements even if those facilities

provide functionally equivalent services." *APT Pittsburgh Ltd. Partnership v.*

*Lower Yoder Twp.*, 111 F. Supp.2d 664, 675 (W.D. Pa. 2000) (quoting H.R. Conf.

No. 104-458, at 208, reprinted in 1996 U.S.C.C.A.N. at 222).

Global has laid out the structure, placement and cumulative impact of all

three towers in a chart. (*See* Doc. 24, p. 25). In almost all respects, the Global

proposal is identical or carries less impact.[20] Thus, with respect to structure and

impact, the three towers are the same. Global's placement of its tower is

comparable to the other two: Global's lot is on the Singer tract, which is 33 acres,

similar in size to PA Cellular's 36 acres and much larger than Sprint's 10.81 acre

lot.

Hamilton does not address the specific characteristics relating to the

structure, placement and impact of the three towers. It does, however, address the

similarities between the existing towers and the proposed one in an attempt to

establish that it did not discriminate against Global. For instance, Hamilton argues

that the Board took the position that the lease site of all three towers constituted

---

[20] The only factor distinguishing Global's proposed tower from the Sprint and PA
Cellular towers is that its placement is on an elevation of 626 feet, whereas the others are
on elevations of 784 and 700 feet, respectively.

land development and created a subdivision. It also argues that the impact on
property values was different: while there was evidence offered that Global's
tower would negatively impact property values, no such evidence was offered with
respect to the Sprint tower, and there was uncontroverted evidence that the PA
Cellular tower would have no such impact.

While there may have been different evidence offered with respect to each
of the three towers and their impact on property values, nonetheless such evidence
fails to form a reasonable basis for treating them differently. As discussed above,
the evidence offered regarding the impact of Global's tower on the property
values, specifically the objector's appraiser testifying that properties would
diminish in value by at least $10,000.00, has been undermined inasmuch as it not
only failed to consider how this impact would be out of line with the that of other
permitted C zoning uses if such were approved, but also failed to address that the
alleged disproportionate impact had a high probability of occurring. Because this
testimony fails to fully develop the relevant issues under the TCA, its value is
limited. Accordingly, the impact of Global's proposed tower has not been
distinguished from such impact of the other two towers on the basis on property
value impacts.

Global identified the specific factors of the structure, placement and impact of the three towers to identify their common characteristics. Objectors failed to rebut this objective showing with non-subjective evidence.[21] Having concluded that the structure, placement or cumulative impact of the existing towers makes them as intrusive or more intrusive than Global's proposed tower, the other providers are similarly-situated to Global. *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 480 n. 7 (1999). Given these facts, it appears clear that the Board discriminated against Global.

### (3) Was the discrimination unreasonable?

Hamilton argues that even if discrimination occurred, it was not unreasonable. In support of this argument, Hamilton maintains that the other two providers satisfied all requirements of the special use, but that Global did not. It also contends that it is permitted to treat facilities with different visual, safety or aesthetic concerns differently. For theses reasons, it submits, the differential treatment was not unreasonable and therefore not in violation of the TCA.

---

[21] The testimony offered regarding the diminution is property values based, in part, on the perception that no one wished to purchase property near or in sight of a radio tower. (Dec. 8, 2009 Hearing Tr., p. 1206:19–1207:1).

38

*(a) Does the Application comply with the Ordinance?*

The Board's decision concluded that Global's application failed to comply with the several requirements of the Ordinance:

*i. § 501.2 (Fencing)*

Section 501.2 provides that "no open or mesh fence along the sides or front edge of any front yard shall be greater than six feet in height." (Docs. 23, 32 ¶ 71; Doc. 23-4, p. 44). Although the maximum height permitted is 6 feet, Global proposed a 7-foot around the leased area. However, Global points out that both the PA Cellular tower and the Sprint tower, despite having fences in excess of 6 feet, received approval from the Board. Both PA Cellular and Sprint sought and received a variance on this provision of the Ordinance. Nonetheless, Global is entitled to the same such variance, thus bringing the Application into compliance with the requirements of the Ordinance.

*ii. Schedule II (minimum lot area)*

Note 2 to Schedule II provides that the it is inapplicable to special uses. (Docs. 20, 30 ¶ 127). Instead, the Ordinance directs that §402.2 is the provision regarding minimum lot areas that governs special uses. (*Id*.).  Under §402.2, radio and transmission towers, such as the one Global proposes, are categorized under Use Class 12 (b). (*Id*. at ¶ 129; Doc. 23-4, p. 33). Subsection (d) further provides

that such uses shall comply with the bulk regulations established in the district where it is located. (*Id.*).

Here, Global's tower would be located in a C zoning district. As noted above, the regulations provide the following applicable dimensions: 1 acre minimum lot area; 150 feet minimum width and depth; 40 feet minimum front yard setback; and 20 feet maximum rear and each side yard setback. (Docs. 20, 30 ¶ 126). Global's proposal did not meet these dimension, as the leased lot provided instead is 100 X 100 feet. [22]

With respect to all three towers, the Board concluded that such development implicates a new "lot" to which the minimum areas are applicable. Global argues the leased area is not a "lot" because it was not the Singer's intent to create a lot with the lease due to tax abatement rollback penalties. Global also notes that the Ordinance expressly allows for more than one use on a lot without subdividing and that the lease term is temporary. These factors, it maintains, do not support the determination that the proposal constitutes land development[23] and creates a new

---

[22] Although the Singer Tract is 30 acres, Global's leased area consists of just less that 1/4 of an acre.

[23] The MPC defines "land development" as any of the following activities:

    (1) The improvement of one lot or two or more contiguous lots, tracts or parcels of

(continued...)

lot, triggering the minimum bulk regulations applications of Schedule II and C

districts.

Whether a proposed land use comes within the statutory definition of "land

development plan" in the Municipalities Planning Code is a question of law, and,

therefore, is not determined by agreement or admission. *Lehigh Asphalt Paving*

*and Const. Co. v. Bd. of Supervisors of East Penn Township*, 830 A.2d 1063 (Pa.

---

[23](...continued)
land for any purpose involving:

>> (i) a group of two or more residential or nonresidential buildings, whether proposed initially or cumulatively, or a single nonresidential building on a lot or lots regardless of the number of occupants or tenure; or

>> (ii) the division or allocation of land or space, whether initially or cumulatively, between or among two or more existing or prospective occupants by means of, or for the purpose of streets, common areas, leaseholds, condominiums, building groups or other features.

> (2) A subdivision of land.

> (3) Development in accordance with section 503(1.1).

Additionally, it defines a "subdivision" as

> [T]he division or redivision of a lot, tract or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot lines for the purpose, whether immediate or future, of lease, partition by the court for distribution to heirs or devisees, transfer of ownership or building or lot development: Provided, however, [t]hat the subdivision by lease of land for agricultural purposes into parcels of more than ten acres, not involving any new street or easement of access or any residential dwelling, shall be exempted.

53 Pa. C.S.A. §10107

Commw. Ct. 2003). In support of its position, Hamilton cites the Pennsylvania

Supreme Court case of *Upper Southampton Township v. Upper Southampton*

*Township Zoning Hearing Board*, 594 Pa. at 58, 934 A.2d 1162 (2007), which

noted that "the statutory focus, in land development plans, [is] upon large-scale

issues such as the 'location and bulk of buildings and other structures, intensity of

use or density of development, streets, ways and parking facilities, common open

space and public facilities.'" *Id*. at 69, 1168. It further observed:

> The type of division or allocation of land contemplated by the MPC-
> e.g., a housing development, condominiums, or building
> groups-implicates many legitimate governmental concerns affecting
> the general public, such as sanitary sewer, water, storm water
> management, parking areas, driveways, roadways, curbs and
> sidewalks.

*Id*. at 168–69. Based on theses considerations, the Pennsylvania Supreme Court

concluded that the construction of a billboard did not give rise to any of those

concerns. *Id*.

The *Upper Southhampton* Court further found that the case was analogous

to another, *Tu–Way Tower Co. v. Zoning Hearing Board of Salisbury Township*,

688 A.2d 744 (Pa. Commw Ct. 1997), in that "[n]one of the concerns addressed by

land development plans is applicable to this minor use of the properties in

question." *Id*. In *Tu-Way*, the applicant intended to expand a communications

tower or erect two new ones and to construct accessory buildings. The Commonwealth Court found that this proposal did not rise to the level of land development. *Tu-Way*, 688 A.2d at 747. In drawing a comparison between the *Tu-Way* holding to the *Upper Southhampton* case, the Pennsylvania Supreme Court stated that "[t]he common thread in these decisions is that the proposed use of the land did not include the construction of residential or commercial buildings."

Much like those cases, this matter does not involve the type of extensive development that impacts the community in terms of use of sewer capacity, traffic ingress and egress and parking concerns. Accordingly, the lease does not constitute land development or create a new lot which would trigger the application of the bulk regulation requirements noted above. The failure to meet these requirements cannot, therefore, form a basis to deny the Application.

*iii.  §501.8 (safe access to building or structure).*

The Board also cites §501.8 as a provision with which Global's Application does not comply. It provides:

> All buildings or structures hereinafter erected or moved shall be located on a lot adjacent to a public street or with access to an approved private street and all buildings or structures shall be so located on a lot as to provide safe and convenient access for servicing, fire protection and off-street parking.

(Docs. 23-4, p. 43). The plain language of this section of the Ordinance deals with structure placement on a lot vis-a-vis the road, which Global has satisfied. In addressing security precautions, such as a gate, under this section, the Board applied the provision beyond its stated purpose.

### iv. §504.1 (e) (hard weather surfaces)

Global offered evidence that the driveway would be graded and surfaced with gravel. (Doc. 30, ¶ 150). The Board determined that Global did not meet the requirements of §504.1 (e), which provides:

> All parking areas and drives for commercial or industrial uses that are (sic) require shall have a hard all-weather surface of either concrete or bituminous composition.

(Doc. 23-4, p. 48). Global argues that as a special use, a radio tower is neither a commercial nor an industrial use and, accordingly, section 504.1(e) is inapplicable. Indeed, there is no support for the proposition, or conclusion, that a special use is either industrial or commercial. Accordingly, the Board's determination on this issue lacks merit.

### v. §506.1 (c) (driveway entrance)

The Board also determined that Global was not in compliance with §506.1 (c) inasmuch as the driveway is or may not be in a suitable location if remaining land on Singer Tract is developed. The provision provides:

44

> [W]here a parcel or building is being developed adjacent to another
> parcel used or suitable for non-residential development, consideration
> is to be given to . . . (1) the location and planning of driveway access
> points to permit their joint use by adjoining parcels so as to minimize
> the number of intersections with the street or highway from which
> they derive their access.

(Doc. 23-4, p. 51). As noted above, Global contends that, based on the fact that the

drive already exists, §506.1 (c)(1) does not apply to its Application. The private

drive's intersection of the road had, at some point, received prior approval and

there is no evidence that Global intended to construct another drive. Accordingly,

there is no driveway location planning attendant to the proposed tower and §506.1

(c) is inapplicable to Global's Application. Global was not, therefore, required to

demonstrate compliance with this section of the Ordinance.

### vi. *Landscaping/screening*

Section 402.2 of the Ordinance provides that landscaping and screening be

provided to protect adjoining areas. (*Id*. at ¶ 74; Doc. 23-4, p. 33 (Ordinance

402.2, Use Class 12 (d))). Adequate screening does not mean that an entire

structure is blocked from view, as there is no landscaping or screening that would

buffer or screen a 250 foot tall tower. (Docs. 23, 32 ¶ 47).

Global's proposed screening, by trees 30–40 feet in height, was rejected by

the Board, which found it to be inadequate and that it screened only the base of the

tower, and did not screen the fence or the equipment behind the fence. (*Id*. at ¶ 77). More specifically, the Board concluded that the landscaping was based on trees outside the leased area as there was no vegetation within the leased area and, in absence of contractual or other restrictions, the landowner could remove the existing vegetation outside of the leased area. (Doc. 32, ¶ 77).

As noted above, however, the Singers responded to this concern, via letter dated May 10, 2010, agreeing not to remove and trees within a contiguous buffer of 50 feet on all sides of the proposed tower. (*Id*. at ¶ 78). Moreover, the expert testimony provided that a 250 foot tower cannot be totally screened from view. Based on these considerations, Global's Application conforms with landscaping and screening requirements.

In sum, the bases for concluding that Global's Application were not in conformity with the objective requirements of the Ordinance are unsupported. . Specifically, it appears that the Board either misapplied the applicable zoning provisions or erred in addressing the applicable facts.

*(b)  Visual, safety and aesthetic concerns*

Despite the Board's conclusion to the contrary, there were no material differences in the aesthetic or visual concerns with respect to the Global tower when compared to the two previously-approved towers. With respect to safety

concerns, Hamilton expressed concern for the private drive's access to the road and it took issue with the fact that the Global tower would be locked and unmanned, making it potentially difficult for emergency personnel to access the site if necessary. As noted above, Global addressed the emergency service concern by stating that it would provide such entities with keys to access the leased area. Additionally, the private drive's intersection of the road had, at some point, received prior approval. Moreover, given the fact that the Global tower would be unmanned, any increase in the volume of traffic intersecting the road from the private drive would be minimal. Although the Board cited concerns that the drive is not presently plowed or cindered , Global stated that the present conditions would not necessarily be the same conditions if the tower were constructed.

With respect to ice falling from the tower or the tower itself falling, the Board concluded that the leased area for such occurrences was substantially smaller and insufficient to guard against such happenings. Specifically, Bohlinger testified that in any failure affecting the entire tower, the fall zone would be approximately 100 X 100 feet.[24] (Doc. 20, 30 ¶ 76).

---

[24] There does not appear to be any testimony as to the fall zone requirements with respect to the other two towers.

The Singer Tract is 30 acres, with only one structure—a barn—located thereon. Moreover, the Singers informed the Board that they would stipulate not to construct a dwelling or any other human-occupied structure within 100 feet of the center of the proposed tower, but allow the barn to remain within 100 feet of the tower. (Doc. 1-3, ¶ 36 (July 14, 2010 Zoning Board decision, p. 73)). This stipulation addresses the immediate issues with present development plans.

Hamilton has thus failed to demonstrate differences in visual, aesthetic, or safety concerns upon which to base its differential treatment of the entities. Given that Global has established differential treatment among providers whose facilities are similarly-situated in terms of structure, placement or cumulative impact, it has carried its burden to state a claim for unreasonable discrimination under the TCA. *USCOC of New Hampshire RSA #2, Inc., supra; MetroPCS, Inc., supra.* (explaining "almost all federal courts considering such cases" have so ruled).

Having concluded that Global's proposed tower was similarly-situated to both Sprint's and PA Cellular's towers, differential treatment by the Board, in the absence of differences in the structure, placement or cumulative impact of the towers, demonstrates that such differential treatment lacked a reasonable basis. Accordingly, inasmuch as the Board unreasonably discriminated against Global, it is entitled to summary judgment on this issue.

48

*(D) State zoning law*[25]

Finally, Global contends that it is entitled to approval of its Application for special use and that the Board's decision constitutes an error of state zoning law. Under Pennsylvania law, a court will reverse the decision of a zoning board when the board has committed an abuse of discretion or an error of law. *Hertzberg v. Zoning Bd. of Adjustment*, 721 A.2d 43, 46 (Pa.1998) (citing *Larsen v. Zoning Bd. of Adjustment*, 543 Pa. 415, 419 (1996). In order to determine whether the board has abused its discretion, the court must determine whether the decision is supported by substantial evidence. *Id*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion". *Id*. (citing *Valley View Civic Ass'n v. Zoning Bd. of Adjustment*, 501 Pa. 550, 555 (1983)).

Having concluded that the Board's decision denying Global's application for special use was not supported by substantial evidence, Global is entitled to

---

[25] Hamilton does not address this issue in its brief. Accordingly, it is deemed unopposed. *See* M.D. PA. LR 56.1.

judgment on its state law claim.[26] Accordingly, it is recommended that summary

judgment be granted on Global's state law claim.

## V. Recommendation

For the foregoing reasons, it is respectfully recommended that Hamilton's

motion for summary judgment ([Doc. 19](#)) be denied and that Global's motion for

summary judgment ([Doc. 22](#)) be granted. Specifically, it is recommended that the

court issue an order directing the Application be granted, and that all necessary

zoning permits and variances be issued. *See Ogden*, *supra* at 397 (ordering

township to issue all required zoning permits and variances issue). *See also*

*T-Mobile Northeast LLC v. City of Lawrence*, 755 F. Supp.2d 286, 292 (D.

Mass.,2010) (under the TCA, an award of injunctive relief, rather than a remand,

is often a preferred method of relief and the proper remedy for a zoning violation

---

[26] Hamilton did not address this claim and, accordingly, Global's motion thereon is considered unopposed. *See Whitaker v. Springettsbury Twp.*, No.:1:08-CV-627, 2010 WL 1565453, *15 (M.D. Pa. April 19, 2010)(A plaintiff's failure to respond to arguments raised in a motion for summary judgment constitutes an abandonment of these causes of action and essentially acts as a waiver of such issues) (citations omitted). *See e.g.*, *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 WL 1084621, at *6 (E.D. Pa. May 6, 2005) (failure to address claims waives opportunity to contest summary judgment on that ground); *Ankele v. Hambrick*, 286 F. Supp.2d 485, 496 (E.D. Pa. 2003) (deeming plaintiff's malicious prosecution claim waived for failing to respond to defendant's argument in summary judgment motion).

50

is an order instructing the local board to authorize construction) (citations

omitted).

     Signed on July 3, 2012.

_____
MILDRED E. METHVIN
U. S. MAGISTRATE JUDGE