**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

GLOBAL TOWER, LLC,

      Plaintiff,

      v.

HAMILTON TOWNSHIP, and ZONING
HEARING BOARD OF HAMILTON
TOWNSHIP,

      Defendants.

CIVIL ACTION NO. 3:CV-10-1705

(JUDGE CAPUTO)

(MAGISTRATE JUDGE METHVIN)

## MEMORANDUM

Presently before the Court is Magistrate Judge Methvin's Report and Recommendation (the "R & R") (Doc. 37) recommending Plaintiff Global Tower, LLC's ("Global") Motion for Summary Judgment (Doc. 22) be granted and Defendants Hamilton Township and the Zoning Hearing Board of Hamilton Township's (collectively "Hamilton") Motion for Summary Judgment (Doc. 19) be denied. Global alleges that the Zoning Hearing Board (the "Board") unlawfully denied its Application to construct a cell tower on leased property in Hamilton Township, Pennsylvania in violation of the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332(c)(7)(B). Because the Board's denial of Global's Application was not supported by substantial evidence and the Board unreasonably discriminated against a provider of functionally equivalent services, Global's motion for summary judgment will be granted and Hamilton's motion for summary judgment will be denied.

## I. Background

Global is a limited liability company formed under the laws of Delaware. (Docs. 20; 30, ¶ 1.) Global leases real estate on which it constructs radio towers, which it then subleases to FCC licensed personal wireless service providers. (*Id*. at ¶ 2) Hamilton Township is a political subdivision located in Monroe County Pennsylvania, and the Zoning Hearing Board of Hamilton Township is an entity created under the Pennsylvania

Municipalities Planning Code ("MPC"). (*Id*. at ¶¶ 3-4.)

On December 16, 2008, Global, through an affiliate, entered into a lease agreement (the "Lease") with Lloyd and Shirley Singer, as trustees of the Singer Trust. (Docs. 23; 32, ¶ 4.)  The Singers own a thirty-acre tract in Hamilton Township, which is in a partially-developed rural area (the "Singer Tract"). (*Id*. at ¶ 5.)  The Singer Tract includes a structure which has been described as a barn, and has a gravel or dirt drive. (*Id*. at ¶ 6.)  The purpose of the Lease was to allow Global to erect a radio tower and to install related equipment on the ground (collectively the "Tower") inside a 100 by 100 foot leased area. (*Id*. at ¶ 7.)  The initial lease term is for five years, with five successive five-year renewal terms, for a total potential lease term of thirty years. (*Id*. at ¶ 8.)

On February 17, 2009, Global, acting through its agent, Fortune Wireless, Inc., filed an application with the Zoning Board requesting "special use" approval to construct the Tower. (*Id*. at ¶ 11.)  On February 2, 2010, Global filed an amended application (the "Application") reflecting a proposed reduction of the Tower's height from 300 feet to 250 feet. (*Id*. at ¶ 12.)  The Tower is to be a three-sided lattice-type construction with clusters of antennas mounted in various locations on the tower, with a seven foot lightning rod on top. (*Id*. at ¶ 13.)  The Tower is to be constructed in accordance with national and local codes, subject to review by the Township code enforcement officer. (*Id*. at ¶ 14.)  The Tower is to be unmanned and does not require water or sewer service. (*Id*. at ¶ 15.)  The two utilities required by the Tower, a telephone line and an electrical line, would be run underground. (*Id*. at ¶ 16.)  Access to the Tower would be restricted to the existing drive, with slight improvements, and the landowner testified that under the Lease, Global would provide maintenance to the Tower and surrounding areas. (*Id*. at ¶¶ 17, 19.)

The Singer Tract is in a C Zoning District which, pursuant to section 402.2 of the Hamilton Township Zoning Ordinance (the "Ordinance"), permits radio and television

transmission or receiving towers as a special use. (*Id*. at ¶ 22.)  Other permitted uses in C districts include, *inter alia*, multi-family residential buildings, commercial and limited commercial uses, light industrial uses, and accessory uses and essential services. (*Id*. at ¶ 23.)  Section 402.2 also requires that special uses refrain from causing injury to other property or jeopardize the public health, safety, welfare, or convenience. (Docs. 20; 30, ¶ 9.)

Twenty hearings on Global's Application were held between April 7, 2009 and June 10, 2010 (collectively "the Hearing"). (Docs. 23; 32, ¶ 27.)  The Board also conducted a view of the Singer Tract on March 17, 2010, during which Global performed a balloon float to a height of approximately 250 feet. (*Id*. at ¶ 28.)  At the Hearing, Global offered the testimony of Frank Chlebnikow, an expert on land use, zoning, and community planning; John Doyle, a real estate appraiser; and Michael Bohlinger, a civil structural engineer. (*Id*. at ¶ 29.)  Objectors to the Tower offered the testimony of Thomas McKeown, a real estate appraiser, and R. Douglas Olmstead, Jr., P.E., a civil engineer. (*Id*. at ¶ 30.)  At the conclusion of the Hearing, Global and the Singers agreed to the imposition of a number of restrictions on the Application in an attempt to alleviate concerns raised during the Hearing.  (*Id*. at ¶ 31.)  Nevertheless, the Board denied Global's Application for special use by a written decision on July 14, 2010. (*Id*. at ¶ 32.)

Prior to ruling on Global's Application, the Board had approved the applications of two other radio towers, Sprint Spectrum and PA Cellular. (*Id*. at ¶ 33.)  The Sprint tower is in a C zoning district, while the PA Cellular tower is located in an A zoning district. (*Id*.)

The Board approved the Sprint tower on February 1, 2000. (*Id*. at ¶ 37.)  Like the Global Tower, the Sprint tower is a 250-foot lattice tower. (*Id*. at ¶ 39.)  The Sprint tower is located on a site that is approximately 784 feet in elevation, on a 50 by 50 foot leased area of a 10.81 acre tract. (*Id*. at ¶¶ 43-44.)  The Global Tower would be on a site approximately

3

626-628 feet in elevation, on a 100 by 100 foot leased tract on a thirty-acre parcel. (*Id*.) Characteristics common to both towers include: three-legged lattice design; equipment cabinets; seven foot high fence topped with barbed wire; lighted; unmanned; providing for future use by other tower companies; and access by private drive. (*Id*. at ¶ 45.)

Sprint's tower, like Global's Tower, is visible above the tree line in various areas of the Township. (*Id*. at ¶ 46.) No landscaping or screening was proposed for the Sprint tower because no landscaping can screen a 250-foot tower. (*Id*. at ¶ 47.) Sprint's lease term was for five years with four additional five-year renewal terms. (*Id*. at ¶ 48.) Due to the likelihood that the Sprint tower would present an attractive nuisance to those wishing to climb the structure, the Board found that "special circumstances support[ed] the Applicant's request to construct a seven-foot high fence topped with barbed wire." (*Id*. at ¶ 48.) No evidence was presented that Sprint's tower would cause substantial injury to the value of other property or jeopardize the public health, safety, welfare, or convenience. (*Id*. at ¶ 49.)

The PA Cellular tower was approved by the Board on November 6, 1996. (*Id*. at ¶ 52.) The PA Cellular Tower is a lattice structure approximately 280 feet in height located in the center of a 150 by 150 foot leased tract of a thirty-six acre parcel. (*Id*.) The PA Cellular tower is located on a site that is approximately 700 feet in elevation. (*Id*. at ¶ 54.) Like the Sprint tower, the Board found that no landscaping or screening would buffer or screen a 280-foot tall tower. (*Id*. at ¶ 55.) Hamilton notes, however, that the existing trees proposed as screening for the Global Tower are outside of the leased area on the Singer Tract. (*Id*.) PA Cellular sought, and was granted, a variance to erect an eight-foot fence topped with barbed wire to prevent trespassers from climbing the tower. (*Id*. at ¶ 56.) As with the Global proposal and the Sprint tower, the PA Cellular Tower: is a three-legged lattice design; has equipment cabinets; is lighted and unmanned; is accessed by a private drive; and is gated. (*Id*. at ¶ 57.) Pursuant to the uncontroverted testimony of the applicant,

the Board concluded that the PA Cellular tower would not substantially impact property values nor negatively affect public health, safety, welfare, or convenience. (*Id*. at ¶ 58.)

In denying Global's Application, consistent with determinations regarding the Sprint and PA Cellular towers, the Board concluded that Global's leased area constituted a new "lot." (*Id*. at ¶ 62.)  The Ordinance provides that "[i]n any district, more than one structure containing a permitted or permissible principal use may be erected on a single lot, provided that yard, lot area and other requirements of this Ordinance shall be met for each structure as thought it were on an individual lot." (*Id*. at ¶ 66.)  As with the determinations made in the Sprint and PA Cellular cases, the Board concluded that Global's Tower was exempt from the height requirements of the Ordinance. (*Id*. at ¶ 67.)

The Board concluded that the leased-area consisted a "lot," which required Global to comply with section 501.2 of the Ordinance. (Doc. 32, ¶ 71.)  Section 501.2 provides that "no open or mesh fence along the sides or front edge of any front yard shall be greater than six feet in height." (*Id*.)  And, because Global did not apply for a variance from this section, Global's submission failed to comply with the Ordinance. (*Id*.)  Global contends, however, that the proposed fence "is not along the sides of the lot or the front edge of the front yard, it's some 400 feet from the road." (Doc. 23, ¶ 71.)  Additionally, the Board concluded that Global's Tower failed to comply with section 504.1(e) of the Ordinance as it sought to have an access road surfaced with gravel, as opposed to a "hard all-weather surface of either concrete or bituminous composition," which the Ordinance requires for "all parking areas and access drives for commercial and industrial uses." (Docs. 23; 32, ¶ 72.)

The Board also found that Global's proposed screening and landscaping was inadequate. (*Id*. at ¶ 77.)  Section 404.2 of the Ordinance requires landscaping and screening be provided to protect adjoining areas. (*Id*. at ¶ 74.)  The Township's engineer testified that adequate screening does not mean that the entire structure is blocked from

5

visibility. (*Id*. at ¶ 75.)  Although Global's Tower would be screened by trees thirty to forty feet in height, the Board rejected the proposal because it only provided for screening of the Tower's base. (*Id*. at ¶ 77.)  More specifically, the Board concluded that the landscaping was based on trees outside of the leased area which could be freely removed by the landowner absent any contractual restrictions to the contrary. (Doc. 32, ¶ 77.)  In response to these concerns, the Singers agreed not to remove trees within a fifty-foot buffer on all sides of the Tower. (Docs. 23; 32, ¶ 78.)

The Tower was designed with the following safety precautions: illumination for aviation safety; grounding of the Tower and accessory equipment to protect it from lightning strikes; it would be surrounded by a seven-foot high fence; no part of the structure below a twenty-foot height level could be used to climb the Tower; the equipment cabinets would be locked and designed with alarms; no electrical or telephone wires would be exposed; it would be able to withstand wind speeds mandated by the most stringent verison of the International Building Code; it complied with all FCC requirements for energy emissions and power density; it provides an acceptable sight distance for the class of driveway proposed; and it would be restricted with a sixteen-foot wide steel field gate. (*Id*. at ¶ 80.)  Global also proposed providing emergency service personnel keys to open the gate, but Hamilton contends that Global did not establish such access by emergency service personnel was adequate or feasible. (*Id*. at ¶ 81.)

The Board also found that Global failed to comply with the requirements of Section 506.1(c) of the Ordinance.  Section 506.1(c) states that when a parcel is being developed adjacent to another parcel used or suitable for non-residential development, consideration is to be given to "the location and planning of driveway access points to permit their joint use by adjoining parcels so as to minimize the number of intersections with the street or highway."  Hamilton contends that the Board correctly applied Section 506.1(c) because

"Global did not introduce into the record any evidence of compliance with Section 506.1(c) of the Ordinance which was applicable since the remaining parts of the Singer Premises are suitable for non-residential development." (Doc. 32, ¶ 84.)

The Board further concluded, based on the testimony of McKeown, that the Tower would cause a diminution in property values. (Docs. 23; 32, ¶ 88.)  Hamilton asserts that based on the testimony presented, the Board simply concluded that McKeown was more credible than Doyle, and the Board believed McKeown's assessment that property values would decrease by at least $10,000.00. (Doc. 32, ¶ 88.)  McKeown opined that the income approach to determine value was the most appropriate method to use. (*Id*. at ¶ 89.)  He specifically testified that "gross rent multiplier is the relationship or ratio between the sales price or value and the gross rental income." (*Id*. at ¶ 90.)  McKeown did not inspect leases or rent rolls to verify his data, but instead he used a range of average rentals based on information from the rental management department of his business. (Docs. 23; 32, ¶ 92.)

According to Doyle, McKeown arrived at the gross multiplies by comparing rents from typical properties with specific values from others. (Doc. 23, ¶ 91.)  Doyle contested McKeown's methodology in a number of respects: McKeown failed to provide evidence that any house within the sight of the Tower would or did rent for a "typical" amount; McKeown did not offer evidence that any properties within sight of the Tower were rental properties; McKeown only used four pairs of rental properties; only one pair of rental properties compared by McKeown was in sight of a radio tower; the houses were dissimilar; and McKeown did not provide support for his position that fears and concerns of the public alone would decrease the property values around the Tower. (Doc. 23, ¶¶ 93-96, 98.)

Conversely, Doyle testified that the Tower would not cause a diminution in property value. (Docs. 23; 32, ¶ 100.)  Doyle applied a "paired sales analysis" method, which compares the value trends of similar residential properties either (a) before and after a

tower is built or (b) within view and not within view of a tower. (Doc. 23, ¶ 101.) McKeown agreed with Doyle's assessment that a "paired sales analysis" method is the most appropriate to apply provided sufficient market data exists. (Doc. 32, ¶ 102.) But, because there was insufficient market data in Hamilton Township to conduct a "paired sales analysis," McKeown opined that the income approach was the best method to determine value. (*Id*. at ¶ 104.)

Due to the insufficiency of data in Hamilton Township, Doyle believed that the better indicator of value was to study four communities that had "housing stock and buyers" similar to Hamilton Township. (Doc. 23, ¶ 105.)   Doyle selected cell tower locations in Berks, Bucks, Chester, and Montgomery Counties for his analysis. (*Id*. at ¶ 101.) Doyle assessed these communities in comparison to Hamilton Township in terms of house values, census data, demographic profile, lot sizes, and surrounding land uses, and he found them to be acceptable for study and comparison. (*Id*. at 106.) While each of the communities studied by Doyle was close to a cell tower, (Docs. 23; 32, ¶ 107), "the Board faulted Doyle because he did not conduct a study of the economic impact of existing towers in the Township." (*Id*. at ¶ 108.) Specifically, the Board stated: "no credible explanation was proffered by Doyle why the impact of the Sprint Spectrum cell tower in Hamilton Township on surrounding property values could not have been analyzed both before and after that tower was erected to determinate the impact of a similar tower on surrounding property values in an area similar to the Applicant's proposed cell tower." (*Id*.)  Instead, the Board found McKeown more credible than Doyle. (*Zoning Hearing Board Decision*, 62.)  The Board, therefore, determined that Global's Tower would adversely impact surrounding property values by at least $10,000.00 (*Id*.)

As identified by Magistrate Judge Methvin, the Board's July 14, 2010 decision reflects: (1) the leased area was a "lot" and was required to comply with minimum lot size

for C zoning district; (2) Global's special use application included several elements that fall outside of the lease area, such as trees for screening, part of the storm water basin, the entrance to the driveway, and the ice fall zone; (3) concern regarding access to the leased area by emergency responders; (4) that the driveway is not presently plowed; (5) the Application did not comply with section 506.1(c); and (6) there was a potential threat to the health, safety, and welfare of persons and/or structures on the Singer property. (Doc. 37.)

As a result of the denial of its Appilcation, Global commenced this action on August 13, 2010. (Doc. 1.)  Hamilton moved to dismiss the Complaint, but the Court denied the request on November 23, 2010. (Doc. 13.)  Thereafter, on September 15, 2011, both Hamilton and Global filed motions for summary judgment. (Docs. 19; 22.)  The instant summary judgment motions were subsequently referred to Magistrate Judge Methvin for a Report and Recommendation. (Doc. 36.)  On July 3, 2012, Magistrate Judge Methvin recommended that Global's motion for summary judgment be granted and Hamilton's motion be denied.  Objections were subsequently filed to the R & R.  Now, as the objections have been fully briefed, they are ripe for disposition.

## II. Legal Standards

### A.    Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)).  A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the

applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248.  An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*. Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2727 (2d ed.1983).  The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).  Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed.R.Civ.P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Id.* (quoting *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B.      Standard for Reviewing a Report and Recommendation**

Where objections to the Magistrate Judge's report are filed, the court must conduct a *de novo* review of the contested portions of the report. *Sample v. Diecks*, 885 F.2d 1099, 1106 n. 3 (3d Cir.1989) (citing 28 U.S.C. § 636(b)(1)(c)). However, this only applies to the extent that a party's objections are both timely and specific. *Goney v. Clark*, 749 F.2d 5, 6–7 (3d Cir.1984) (emphasis added). In conducting a *de novo review*, the court may accept, reject, or modify, in whole or in part, the factual findings or legal conclusions of the magistrate judge. *See* 28 U.S.C. § 636(b)(1); *Owens v. Beard*, 829 F. Supp. 736, 738 (M.D. Pa. 1993). Although the review is *de novo*, the law permits the court to rely on the recommendations of the magistrate judge to the extent it deems proper. *See United States v. Raddatz*, 447 U.S. 667, 675–76, 100 S. Ct. 2406, 65 L. Ed. 2d 424 (1980); *Goney*, 749 F.2d at 7; *Ball v. United States Parole Comm'n*, 849 F.Supp. 328, 330 (M.D. Pa.1994). Uncontested portions of the report may be reviewed at a standard determined by the district court. *See Thomas v. Arn*, 474 U.S. 140, 154, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); Goney, 749 F.2d at 7. At the very least, the court should review uncontested portions for

clear error or manifest injustice. *See, e.g., Cruz v. Chater*, 990 F.Supp. 375, 376–77 (M.D. Pa. 1998).

### III. Discussion

As identified by Magistrate Judge Methvin, Hamilton raises two arguments as to why they are entitled to summary judgment in this action. (Doc. 37, 17.)  First, Hamilton asserts that substantial evidence supported the Board's determination that Global failed to satisfy its burden regarding the Ordinance's special use requirements.  Second, Hamilton argues that Global failed to demonstrate that Hamilton unreasonably discriminated against it in denying the special use application.  On the other hand, Global contends that summary judgment must be granted as to its motion because the rejection of its Application after two nearly identical towers were previously approved constitutes unreasonable discrimination. Global also asserts that Hamilton violated the TCA because the Board's decision is not supported by substantial evidence.  Lastly, Global argues that summary judgment is warranted because the Zoning Board violated state law.

After thoroughly considering these issues, Magistrate Judge Methvin recommended that Global's motion for summary judgment be granted and Hamilton's motion for summary judgment be denied.  Specifically, Magistrate Judge Methvin recommends "that the Court issue an order directing the Application be granted, and that all necessary zoning permits and variances be issued." (Doc. 37, 49.)

As Hamilton has filed a number of objections to the Magistrate Judge's recommendations, these contested portions of the R & R will be reviewed *de novo*.[1]  The

---

[1]     It is proper to resolve the appeal of the Board's zoning ruling on a summary judgment motion. *See Omnipoint Commc'ns, Inc. v. Penn Forest Twp.*, 42 F. Supp. 2d 493, 498 (M.D. Pa. 1999) ("The record for review of the zoning ruling is compiled by the zoning board. It is therefore appropriate to adjudicate such an appeal on a summary judgment motion, with the administrative record providing the undisputed factual basis for the federal court's decision. This is particularly the

uncontested portions of the R & R, including Magistrate Judge Methvin's recommendation to grant Global summary judgment as to the state law claim as unopposed, will be adopted as the recommendations are not clearly erroneous.

## A.     The Telecommunications Act

The Telecommunications Act of 1996 was enacted "'to provide a pro-competitive, de-regulatory national policy framework designed to rapidly accelerate private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." *Ogden Fire. Co. No. 1 v. Upper Chichester Twp.*, 504 F.3d 370, 377-78 (3d Cir. 2007) (quoting *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 473 (3d Cir. 1999) (quoting H.R. Rep. No. 104–458 (1996) (Conf. Rep.), *reprinted* in 1996 U.S.C.C.A.N. 10, 1124)).   While the TCA preserved the traditional authority enjoyed by state and local governments to regulate land use and zoning, "the TCA altered that traditional deference in very important ways insofar as local decisions interfere with, or impact upon, telecommunications facilities." *Id.* at 379.

The TCA provides, in pertinent part, as follows:

(7) Preservation of local zoning authority.

(A) General authority. Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations.

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—

---

case where, as here, there is a contention that the zoning board's decision is not supported by substantial evidence. . . . Accordingly, adjudication of all Telecommunications Act issues on Omnipoint's summary judgment motion is proper.").

(I) shall not unreasonably discriminate among providers of functionally equivalent services; and

(II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

. . .

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7). Accordingly, "'denials subject to the TCA are reviewed by [the] court . . . more closely than standard local zoning decisions.'" *Odgen*, 504 F.3d at 380 (quoting *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 493 (2d Cir. 1999)). After reviewing the Board's written opinion, Magistrate Judge Methvin concluded that the Board's decision to deny the Application was not supported by substantial evidence and amounted to unreasonable discrimination against Global. Hamilton objects to these findings.

### 1.    Substantial Evidence

As noted, the TCA requires that a decision "to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). "Substantial evidence is a legal term of art." *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd. of Easttown Twp.*, 248 F.3d 101, 106 (3d Cir. 2001). "It does not mean a large or considerable amount of evidence, but rather such evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation and internal quotations omitted). "'Substantial evidence requires more than a scintilla but less than a preponderance.'" *T-Mobile Cent. v. Unified Gov't of Wyandotte Cnty.*, 546 F.3d 1299, 1307 (10th Cir. 2008) (quoting *U.S. Cellular Tel. of Greater Tulsa, LLC v. City of Broken Arrow*, 340 F.3d 1122, 1133 (10th Cir. 2003)).

"In determining whether the evidence before an agency was substantial, a court views the record in its entirety and takes account of evidence unfavorable to the agency's decision." *Omnipoint Corp., v. Zoning Hearing Bd. of Pine Grove Twp.*, 181 F.3d 403, 408

(3d Cir. 1999) (citing *Am. Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 523, 101 S. Ct. 2478, 69 L. Ed. 2d 185 (1981)).   As such, while review is highly deferential, it "is not a rubber stamp," and the Board "'is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands.'" *Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 58-59 (1st Cir. 2001) (citing *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.*, 164 F.3d 713, 718 (1st Cir. 1999)).   Although a reviewing court has "no power either to weigh the evidence contained in that record or substitute its own conclusions for those of the fact finder," "if the record as a whole contains conflicting evidence, the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence." *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999) (citations omitted).

In applying these standards, Magistrate Judge Methvin concluded that reasonable minds could not find substantial evidence to support the Board's denial of Global's application based on the diminution of real estate values.   Initially, the Magistrate Judge concluded that "the burden of proof is on the Board to establish that its decision was based on substantial evidence.   If conflicting evidence exists, the Board must explain its reasons for rejecting the other evidence presented." (Doc. 37, 25.)   And, because special uses are presumptively permitted if certain conditions are met under Pennsylvania law, objectors to a special use application bear the burden of showing, with a high degree of probability,[2] that the proposed use will substantially affect the health, safety, and welfare of the public in a negative manner. (*Id*. (citing *Omnipoint Commc'ns v. Zoning Hearing Bd. of Pine Grove*

---

[2]      As noted by Judge Methvin, Pennsylvania law permits a zoning ordinance to place the burden of proof on the applicant to show that the proposed project is not a detriment to the health, safety, and general welfare of the neighborhood.   The Magistrate Judge determined that Hamilton Township's Zoning Ordinance does not specifically place the burden of proof on a special use applicant.

*Twp.*, 20 F. Supp. 2d 875, 879 (E.D. Pa. 1998).)

After reviewing the record, Magistrate Judge Methvin determined that the Board failed to require the objectors to establish with a high probability the diminution in property values that Global's Tower would cause.  Hamilton objects to this finding and asserts that the Magistrate Judge incorrectly determined that the opinion of real estate appraiser McKeown did not constitute "substantial evidence." (Doc. 40, 3.)  In particular, Hamilton contends that Magistrate Judge Methvin "substituted her opinion of the credibility of the two appraisers for the Board's." (*Id*. at 6.)  Furthermore, Hamilton argues:

> [T]he Board was faced with conflicting testimony.  After it weighed the testimony, it concluded that McKeown's opinions were more credible.  This determination was based on the type of objective evidence that reasonable minds could accept as adequate to conclude that the Tower would harm property values.  Had the Magistrate been the fact-finder, she would have concluded differently.  However, this does not mean the Zoning Board's decision was not supported by substantial evidence.

(*Id*. at 8.)

I agree with the Magistrate Judge's conclusion that the Board's decision was not supported by substantial evidence.   Initially, contrary to the assertions of Defendants, Magistrate Judge Methvin did not substitute her own opinion for that of the fact-finder.  Instead, she simply reviewed the Board's written decision and the record before the Board, and reasonably concluded that the Board did not support its decision with substantial evidence.  To reach this conclusion, Magistrate Judge Methvin did not need to, nor did she, substitute her judgment for the Board's judgment.  Rather, she reviewed the Board's written decision, and, as discussed in detail below, logically found that the Board failed to conduct *any* weighing of the property valuation opinion offered by McKeown.

As noted by Magistrate Judge Methvin, "[n]either aesthetic reasons nor the conservation of property values nor the stabilization of economic values in a township are, singly, or combined, sufficient to promote the health or the morals or the safety or the general welfare of the township or its inhabitants or property owners." *Soble Const. Co. v.*

16

*Zoning Hearing Bd. of the Borough of East Stroudsburg*, 329 A.2d 912, 917 (Pa. Cmwlth. 1974).  Parties in opposition to a special exception cannot sustain their burden of proof by "'merely introducing evidence to the effect that property values in the neighborhood may decrease.'" *A. J. Grosek & Assocs. v. Zoning Hearing Bd. of Montrose Borough*, 450 A.2d 263, 266 (Pa. Cmwlth. 1982) (quoting *Soble*, 329 A.2d at 917).  Instead, they must show "'a high degree of probability that it will [substantially] affect the health and safety of the community.'" *Manor Healthcare Corp. v. Lower Moreland Twp. Zoning Hearing Bd.*, 590 A.2d 65, 71 (Pa. Cmwlth. 1991) (quoting *In re O'hara's Appeal*, 389 Pa. 35, 53-54, 131 A.2d 587, 596 (1957)).

Here, I am convinced that the Board did not apply the proper burden of proof in making its decision to deny Global's Application.  While a zoning ordinance may shift the burden of proof to the applicant to demonstrate that the special use would not harm the health or welfare of the community, Hamilton's Ordinance does not contain such a burden shifting provision.  The Board's misapplication of the parties' burden is apparent in the Board's written decision, which states: "the Ordinance specifically requires proof that the Special Use will *not* cause substantial injury to the value of other property where it is located"; "*nor did the Applicant prove* that the Applicant's proposed cell tower will conserve property values as required by Section 802.3"; and "the Applicant has *not persuaded* the Board that the Applicant sustained *its burden* of proof of all elements . . ." (*Zoning Hearing Board Decision*, 60-64 (emphasis added).)  Based on the foregoing excerpts from the Board's written opinion, it is clear that the Board incorrectly required Global to prove that property values would not be impaired, instead of requiring the objectors demonstrate by a high probability that the Tower would pose a negative impact on the safety and health of the community.

By misconstruing the parties' burdens, the Board did not review the evidence to

determine whether the objectors made an adequate showing to satisfy their burden as to the impact on property values.  The Board, improperly, reviewed the evidence to highlight the deficiencies in Global's case as opposed to examining the sufficiency of the evidence offered by the objectors. (*Zoning Hearing Board Decision*, 60.)  In particular, while the Board criticized Global's real estate expert's testimony- finding Doyle's approach required "a leap of faith", noting that he failed to use the Sprint Spectrum tower to compare real estate values, and faulting his decision to rely on properties in other Pennsylvania counties for his analysis, (*Id*. at 60-62)- the Board failed to conduct any analysis as to the methodology relied on by the objectors' real estate expert. (*Id*. at 62.)  Indeed, the Board's discussion as to the strength of McKeown's valuation method was limited to the following passage:

> [T]he Board finds that Objector Leopold Zappler's expert, Thomas McKeown, was more credible than Mr. Doyle.  Based upon Mr. McKeown's testimony, the Board finds that the proposed cell tower will have an adverse impact on surrounding property values of at least $10,000.00 for those properties in close proximity to the proposed cell tower and those which are in the line of sight of the proposed cell tower.

(*Id*.)

The Board's conclusory acceptance of McKeown's testimony, without any explanation as to "the credibility judgements it made" and without any "reasons for crediting one piece of evidence over another," demonstrates a clear failure to "examine the evidence as a whole, *taking into account whatever in the record fairly detracts from its weight*." *T-Mobile Cent., LLC v. Charter Twp. of W. Bloomfield*, - - - F.3d - - -, 2012 WL 3570666, at *3 (6th Cir. Aug. 21, 2012) (quoting *Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky.*, 227 F.3d 414, 423 (6th Cir. 2000)) (emphasis added).  Simply put, Hamilton's position that the Board relied on substantial evidence is undercut by the Board's failure to discuss the portions of Doyle's testimony which may have detracted from the weight of McKeown's opinion.  The Board conducted a one-sided review of the evidence without any discussion of the relative strengths and/or weaknesses of McKeown's testimony.  By adopting crucial,

18

disputed testimony in such a cursory fashion without explanation as to why McKeown's testimony (which Doyle raised a number of objections to) is credible, the Board's decision to credit this evidence cannot be characterized as based on substantial evidence.  Indeed, if the contrary result was reached in this case, review of the Board's decision would amount to nothing more than "rubber stamping."   Thus, without weighing the evidence or substituting my own conclusions for that of the Board, *see Borough of Ho-Ho-Kus*, 197 F.3d at 71, I find that the Board's denial of Global's application due to a decline in property values is not supported by substantial evidence because the Board's written opinion with respect to the property value evidence demonstrates that the record was not reviewed in its entirety and the Board failed to take into account evidence that arguably detracted from the weight of McKeown's methodology.

Furthermore, even if the Board properly applied the burden of proof in their decision, I find that objectors failed to establish their objections with a sufficiently high degree of probability.   "The counter obligation of presenting evidence with respect to a general detriment to health, safety, and welfare lies with the objector.  The objector must show that any adverse impact as a result of the proposed use is abnormal, and that there is a high probability of occurrence." *Stein v. Easttown Twp. Bd. of Supervisors*, 532 A.2d 906, 910 (Pa. Cmwlth. 1987) (citation omitted).   As noted by the Magistrate Judge, there is no evidence of record that the alleged negative impact associated with Global's Tower differs from the impact correlated with other uses allowed within C zoning districts, such as multi-family residential use, commercial use, or industrial use. (Doc. 37, 30.)  Likewise, there is no evidence of record that the adverse impact on property values that would occur from the proposed Tower would be "abnormal" or greater than what would normally be associated with any other tower.  As the objectors did not make these showings, they failed to establish, by a high probability, the potential impact that Global's Tower would have on the

19

community.  Accordingly, I will adopt Magistrate Judge Methvin's recommendation that the Board's decision was not supported by substantial evidence.

## 2.    Discrimination

In addition to requiring that the denial of a request for construction of a personal wireless service facility be in writing and supported by substantial evidence, the TCA also prohibits discrimination against providers that provide functionally equivalent services. *See* 47 U.S.C. § 332(c)(7)(B)(i)(I).  The unreasonable discrimination provision "seeks to ensure that, once the municipality allows the first wireless provider to enter, the municipality will not unreasonably exclude subsequent providers who similarly wish to enter and create a competitive market in telecommunications services." *Nextel W. Corp. v. Unity Twp.*, 282 F.3d 257, 264 n.6 (3d Cir. 2002).

To establish its claim, Global must demonstrate that it offered functionally equivalent services and that the Board unreasonably discriminated against it. *See APT Pittsburgh Ltd. P'ship v. Lower Yoder Twp.*, 111 F. Supp. 2d 664, 674 (W.D. Pa. 2000).[3]  "To preserve the ability of local governments and zoning boards to take into account the uniqueness of land, the TCA 'explicitly contemplates that some discrimination . . . is allowed.  Any discrimination need only be reasonable.'" *Nextel W. Corp.*, 282 F.3d at 267 (quoting *AT&T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 427 (4th Cir. 1998)).  Accordingly, "[d]iscrimination may be impermissible where a municipality favors one provider by permitting it to locate in a particular area at the exclusion of others, thereby creating unfair competitive advantage." *Id*. (citing *W. PCS II, Corp. v. Extraterritorial Zoning Auth.*, 957 F. Supp. 1230, 1237-38 (D. N.M. 1997)).  "[R]elief under the TCA's discrimination provision . . . require[s] a showing that the other provider is similarly situated, *i.e.*, that the structure,

---

[3]    Hamilton does not object to the Magistrate Judge's finding that Global's services were functionally equivalent to those offered by PA Cellular and Sprint Spectrum.

placement or cumulative impact of the existing facilities makes them as or more intrusive than the proposed facility." *Id*. (citation omitted).

Applying this authority, Global laid out the structure, placement, and cumulative impact of its Tower, the Sprint Spectrum Tower, and the PA Cellular Tower in a chart to compare and contrast the similarities and differences of the structures.  (Doc. 37, 35.) Magistrate Judge Methvin determined that with respect to structure and impact, the three towers are the same.  And, she found that Global's Lease is on a 33 acre tract of land, similar to the tract on which PA Cellular's tower sits (36 acres), and much greater than the tract where the Sprint tower is located (10.81 acres). (*Id*.)

In arguing against the evidence presented by Global, Hamilton did not address the specific characteristics relating to the structure, placement, and impact of the proposed Tower.  Hamilton instead addressed the similarities in the treatment of the existing towers and Global to demonstrate that it did not discriminate in this matter.  Specifically, Hamilton claims that in all three cases, the Board took the position that the leased sites constituted land development.  Additionally, Hamilton argues that there was evidence offered in this case that Global's tower would negatively impact property values, whereas no such evidence was offered in the Sprint Spectrum case, and there was uncontroverted evidence in the PA Cellular case that the tower would have no such impact.

Ultimately, the Magistrate Judge found that the Board unreasonably discriminated against Global.  Although she noted that there may have been different evidence offered in all three cases, Magistrate Judge Methvin concluded that the "evidence fails to form a reasonable basis for treating them differently." (Doc. 37, 36.)  As noted, because the property value evidence failed to fully address whether the Tower had a high probability of negatively impacting property values, the Magistrate Judge found that the property valuation testimony was of limited value to the discrimination claim.  And, since Global's evidence

demonstrated the similarities between its Tower and the Sprint Spectrum and PA Cellular towers, and the objectors failed to rebut this showing with non-subjective evidence, Magistrate Judge Methvin concluded that the Board clearly discriminated against Global. The Magistrate Judge also rejected Hamilton's argument that any discrimination of Global was reasonable because Global failed to comply with the special use requirements, while PA Cellular and Sprint were able to satisfy these obligations.  Magistrate Judge Methvin instead found that the Application complied with the Ordinance requirements related to land development, fencing, minimum lot area, building access, driveway surfacing and entrances, and buffering/screening that the Board relied upon in rejecting Global's Application.  Accordingly, the R & R recommends granting Global's motion for summary judgment on its unreasonable discrimination claim.

Hamilton objects to the Magistrate Judge's recommendation.  First, Hamilton argues that the R & R erroneously concluded that the Ordinance requirements related to land development, fencing, minimum lot area, building access, driveway surfacing and entrances, and buffering/screening did not apply to Global's Application.  Second, Hamilton argues that even if Hamilton discriminated against Global, the discrimination was not unreasonable.  The objections will be addressed in turn.

### a.   Ordinance Provisions

### i.   Land Development

Under the Ordinance, radio and transmission towers, such as Global's Tower, are categorized under Use Class 12(b), and such special uses must comply with the Ordinance's bulk regulations. (Doc. 37, 38.)  As such, the regulations provide the following applicable dimensions: one acre minimum lot area, 150 feet minimum width and depth; 40 feet minimum front yard setback; and 20 feet minimum rear and each side yard setback. (*Id*. at 39.)  Global's proposal did not meet these dimensions, as the leased area is only 100

by 100 feet, but Global asserts that the Lease did not create a new lot and the thirty-acre Singer Tract satisfies all requirements. (*Id.*) The Magistrate Judge agreed and found that the Lease did not involve land development or create a new "lot which would trigger the application of the bulk regulation requirements." (*Id.* at 47.) These restrictions, therefore, could not serve as the basis to deny Global's Application according to Magistrate Judge Methvin.

Hamilton objects to the Magistrate Judge's recommendation and asserts that Global's proposed development of the Singer Tract constitutes land development under the Municipalities Planning Code ("MPC"), 53 Pa. Stat. Ann. §§ 10101-11202. (Doc. 41, 12.)

The MPC defines "land development" as any of the following activities:

(1) The improvement of one lot or two or more contiguous lots, tracts or parcels of land for any purpose involving:

(i) a group of two or more residential or nonresidential buildings, whether proposed initially or cumulatively, or a single nonresidential building on a lot or lots regardless of the number of occupants or tenure; or

(ii) the division or allocation of land or space, whether initially or cumulatively, between or among two or more existing or prospective occupants by means of, or for the purpose of streets, common areas, leaseholds, condominiums, building groups or other features.

(2) A subdivision of land.

(3) Development in accordance with section 503(1.1).

53 Pa. Stat. Ann. § 10107. And, the MPC defines a "subdivision" as"

The division or redivision of a lot, tract or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot lines for the purpose, whether immediate or future, of lease, partition by the court for distribution to heirs or devisees, transfer of ownership or building or lot development: Provided, however, That the subdivision by lease of land for agricultural purposes into parcels of more than ten acres, not involving any new street or easement of access or any residential dwelling, shall be exempted.

*Id.*

In concluding that this matter does not involve "land development," Magistrate Judge Methvin relied on the Pennsylvania Commonwealth Court's decision in *Tu-Way Tower Co.*

*v. Zoning Hearing Bd. of Twp. of Salisbury*, 688 A.2d 744 (Pa. Cmwlth. 1997).  In *Tu-Way*, the plaintiff appealed the zoning board's denial of its application for a special exception to extend its existing communication tower by 200 feet and/or construct two new 200-foot communications towers and accessory buildings on a twelve-acre plot of land owned by the plaintiff. *See id*. at 745.  On appeal, one issue addressed by the Commonwealth Court was whether the plaintiff's proposal constituted "land development" under the MPC. *See id*. at 746.  The court determined that the plaintiff's proposal did not qualify as land development because "Tu-Way did not come before the Board to develop its land with residential or commercial buildings but, rather, to extend a tower or erect additional towers, activities which are not defined as land development under the MPC." *Id*. at 747.

Hamilton attempts to distinguish *Tu-Way* from the instant case because the plaintiff in that action owned the entire property while Global intends to lease only a portion of the Singer Tract.  Hamilton's position finds some support under Pennsylvania law. *See, e.g., Ogden Fire Co. No. 1 v. Upper Chichester Twp*., No. 05-1031, 2007 WL 137848, at *2 (E.D. Pa. Jan. 17, 2007) ("the Pennsylvania Commonwealth Court has consistently held that leases which allocate land, as opposed to assigning positions on a pole or tower, constitute a subdivision or allocation of land in accordance with Section 107(a) of the MPC"); *Lehigh Asphalt & Paving Const. Co. v. Bd. of Supervisors of E. Penn Twp*., 830 A.2d 1063, 1071 (Pa. Cmwlth. 2003) ("the allocation of land between the existing single-family residential use and the proposed expansion of the quarry use" effects a land development within the meaning of the MPC); *White v. Twp. of Upper St. Clair*, 799 A.2d 188, 202 (Pa. Cmwlth. 2002) ("lease, which conveys the use of a discrete parcel of land from the Township to Crown for up to 100 years, creates a subdivision").

More recently, however, the Pennsylvania Supreme Court has indicated that the mere lease of land does not constitute land development or a subdivision under the MPC.

24

In *Upper Southampton Twp.*, the Court granted review "to explore the question of whether the construction of billboards qualifies as 'land development' for purposes of the [MPC]." *Upper Southampton Twp. v. Upper Southampton Twp. Zoning Hearing Bd.*, 594 Pa. 58, 60, 934 A.2d 1162, 1163 (2007). The appellant sought to erect six billboards on four lots in Bucks County after her entered into leases with the owners of the lots, which were already being used for commercial purposes. *See id.* Both the trial court and Commonwealth Court concluded that the allocation of land for the construction of billboards constituted land development within the meaning of the MPC. *See id.* 594 Pa. at 63, 934 A.2d at 1165. The Commonwealth Court relied on *White* and *Lehigh* in support of its conclusion. *See id.*

The Pennsylvania Supreme Court reversed the Commonwealth Court's finding that the construction of billboards qualifies as land development under the MPC and found the matter more analogous to *Tu-Way* than *White*.[4] The Court initially recognized that the "definition of land development, of course, does not exist in a vacuum." *Id.* 594 Pa. at 67, 934 A.2d at 1168. However, "the case law typically involves the division of a tract of land into smaller parcels for the construction of either residential or commercial buildings. . . . The type of division or allocation of land contemplated by the MPC- *e.g.*, a housing development, condominiums, or buildings groups- implicates many legitimate governmental

---

[4]    In *White*, the township entered into an agreement with Crown Communications to construct a communications tower in a public park. 799 A.2d at 191. The lease was for an initial twenty-five year term and included a renewal option for three successive terms. *See id.* The lease was for .428 acres of the 200-acre park. Construction of the tower also included construction of a twenty-foot wide, one quarter mile long road, as well as three adjoining buildings for equipment. *See id.* The Commonwealth Court concluded that the lease which conveyed the use of a discrete parcel of land for up to 100 years constituted a "subdivision" within the meaning of the MPC. *See id.* at 202. Global notes a number of differences between *White* and the facts here- the Lease is for a significantly shorter period of time, the Leased area is in a rural tract as opposed to a public park, and the necessary construction is much less extensive in this case.

concerns affecting the general public." *Id*. 594 Pa. at 68-69, 934 A.2d at 1168-69.  And, as the construction of the billboards did not also involve the erection of accessory buildings, fences, or access roads, the Court concluded:

> It would be an absurd or unreasonable reading of the statute to conclude that a use that does not involve such development of the land becomes one merely because the property owners granted the appellant the right to erect the billboards through leaseholds, rather than erecting the billboards on their own. *The leases, by themselves, cannot convert a use of land that does not rise to the level of land development to a use that does*.  The manner of the creation of appellant's interest in the subject properties, limited as that interest is, does not alter or enhance the proposed use.

*Id*. 594 Pa. at 70-71, 934 A.2d at 1169-70 (emphasis added).

I find *Upper Southampton Twp*. to be controlling over the instant action.[5]  Thus, the mere fact that Global entered into the Lease in order to construct the Tower, by itself, does not qualify as land development for the purposes of the MPC.  Moreover, Global's Tower does not raise concerns identified by the *Upper Southampton Twp*. Court for this construction to constitute land development- as Global's proposal does not involve the construction of residential developments, housing condominiums, or commercial buildings. As such, I agree with Magistrate Judge Methvin's reasoning:

> Much like those cases [*Upper Southampton Twp*. and *Tu-Way*], this matter does not involve the type of extensive development that impacts the community in terms of use of sewer capacity, traffic ingress and egress, and parking concerns.   Accordingly, the lease does not constitute land development or create a new lot which would trigger the application of the bulk regulation requirements. . . .

(Doc. 37, 42.)  Global's failure to satisfy these requirements, therefore, cannot justify the basis for the denial of its Application.

---

[5]      Although there are some similarities between this case and *White*, the instant matter involves a much shorter lease term and lacks the extensive development required by the construction of the communications tower in *White*.  More importantly, I am required to apply Pennsylvania law as enunciated by the Pennsylvania Supreme Court.

### ii.   Fencing

Section 501.2 of the Ordinance provides that "no open or mesh fence along the sides or front edge of any yard shall be greater than six feet in height."  Although the maximum height permitted is six feet and Global proposes a seven-foot fence, both PA Cellular and Sprint Spectrum received approval from the Board despite having a fence in excess of six feet in height.  Accordingly, Global is entitled to the same variance, thus bringing the Application into compliance with the requirements of the Ordinance.

### iii.   Safe Access

The Magistrate Judge also faulted the Board's rejection of Global's Application due to non-compliance with Section 501.8 of the Ordinance. (Doc. 37, 45-47.)  Section 501.8 provides as follows:

> All buildings or structures hereafter erected or moved shall be located on a lot adjacent to a public street or with access to an approved private street and all buildings or structures shall be so located on a lot as to provide safe and convenient access for servicing, fire protection and required off-street parking.

The Board expressed concern for the private drive's access to the road and the fact that the Tower would be locked and unmanned, making it potentially difficult for emergency personnel to access the site if necessary.  Magistrate Judge Methvin concluded that Global sufficiently satisfied all of Hamilton's emergency services concerns by offering to provide emergency services with keys to access the site. (Doc. 37, 46.)  The Magistrate Judge found that "the plain language of this section of the Ordinance deals with structure placement on a lot vis-a-vis the road," and "in addressing security precautions, such as a gate, under this section, the Board applied the provisions beyond its stated purpose." (*Id*. at 43.)

Hamilton objects to the Magistrate Judge's findings and asserts that the R & R fails to afford the Board's interpretation of Section 501.8 the great deference it deserves. (Doc. 40, 16.)  Hamilton contends that the R & R fails to acknowledge the risk that a locked gate

can have on safety responders. (*Id*.)

I agree with the Magistrate Judge's recommendation.  First, to the extent that Global proposed to leave the gate unlocked, Hamilton would likely claim that the unlocked gate posed a risk to those unauthorized individuals attempting to access the Tower.  Anyways, by offering to provide keys to emergency service providers, Global has sufficiently alleviated Hamilton's concern that a locked gate could frustrate the efforts of responders.  Additionally, a complete reading of section 501.8 confirms the Magistrate Judge's conclusion that this section deals with placement of buildings and structures with respect to access from the roadway.

### iv.    Hard Weather Surfaces

Section 504.1(e) provides that "[a]ll parking areas and access drives for commercial and industrial uses that are (sic) require shall have a hard all-weather surface of either concrete or bituminous composition."  Global's proposed access road would be graded and surfaced with gravel.  The Magistrate Judge concluded that section 504.1(e) is inapplicable because "as a special use, a radio tower is neither commercial nor an industrial use." (Doc. 37, 43.)

Hamilton's objection to the Magistrate Judge's recommendation consists of two sentences: "The special use in question <u>is a cell tower located in a commercial zoning district</u>.  It is obviously a commercial use subject to Section 504.1(e)." (Doc. 40, 17 (emphasis in original).)  Yet, Hamilton provides no support for the proposition that Global's unmanned Tower constitutes a commercial or industrial use.  Furthermore, the Zoning Ordinance itself does not define the Tower as a commercial or industrial use, instead classifying it under "appropriate public uses."  As such, I agree with Magistrate Judge Methvin's reasoning that the Board misapplied this section.

### v.   Driveway Entrance

Hamilton also objects to the Magistrate Judge's finding that section 506.1(c) does not apply to Global's Application because the driveway already exists, and, at some point, the drive's intersection with the road received approval.  Section 506.1(c) provides:

> Where a parcel or building is being developed adjacent to another parcel used or suitable for non-residential development, consideration should be given to . . . (1) The location and planning of driveway access points to permit their joint use by adjoining parcels so as to minimize the number of intersections with the street or highway from which they derive their access.

Hamilton argues that no language in section 506.1(c) makes the provision inapplicable in the event of a pre-existing driveway.  Hamilton thus contends that the Board's interpretation of its Ordinance was not given the weight and deference it deserved.

Despite Hamilton's argument to the contrary, section 506.1(c) contemplates the location and planning of driveway access points with the street or highway.  Here, the driveway is already in existence.  As a result, no planning of driveway access points was necessary to provide access to Global's Tower.  Section 506.1(c), therefore, is inapplicable to Global's Application.

### vi.   Buffering/Screening

Section 402.2 of the Ordinance requires that landscaping and screening be provided to protect adjoining areas.  Adequate screening does not mean that an entire structure is blocked from view, as there is no landscaping that would buffer or screen a 250-foot tall tower. (Docs. 23; 32, ¶ 47.)    As noted by Magistrate Judge Methvin, the Board rejected Global's proposed screening because it only screens the base of the Tower. (Doc. 37, 44-45.)  In addition, the Board concluded that the landscaping was based on trees outside of the leased area as there was no vegetation within the leased area and, in the absence of contractual or other restrictions, the landowner could remove the existing vegetation outside of the lease area. (*Id*. at 45.)

In light of this concern, the Singers agreed not to remove trees within a contiguous buffer of 50 feet on all sides of the Tower. (*Id*.) Because the expert testimony provided that it is not possible to fully screen a 250-foot tower, the Magistrate Judge concluded that Global's Application conformed to the landscaping and screening requirements.

Hamilton objects to this conclusion and asserts that Global's own expert testified that a 100-foot area surrounding the leased area was necessary for screening. (Doc. 40, 20.) However, Hamilton points to no language in the Ordinance that such extreme screening is required.  Moreover, as Magistrate Judge Methvin noted, in the Sprint Spectrum case, "no landscaping or screening was proposed for the Sprint tower," and it would be impossible to fully screen a 250-foot Tower. (*Id*. at 7); *see also Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp.*, 20 F. Supp. 2d 875, 881 (E.D. Pa. 1998) ("it is absurd to think that any Zoning Ordinance would require a tower to be obscured from view by a fence at least 114 feet high. . . . [T]his provision . . . would have the effect of prohibiting the provision of wireless services in contravention of the plain language of the TCA").  Thus, in line with this authority, Global's Application complied with the objective buffering requirements of the Ordinance.

> ### b.    Unreasonable Discrimination

Based on the foregoing, the Magistrate Judge concluded that the Board applied the Ordinance requirements to Global's Application in an unreasonably discriminatory manner. This recommendation will be adopted.  Global has convincingly established that it was similarly-situated to the Sprint Spectrum and PA Cellular towers, that the Board treated it differently, and that the structure, impact, and placement of its Tower is not any more intrusive than the Sprint Spectrum or PA Cellular towers.  Global, therefore, has proven that the Board's discriminatory treatment of its Application lacked a reasonable basis.

Furthermore, Hamilton's remaining arguments in support of their objections to the

R & R are unpersuasive.  Hamilton's claim that the Magistrate Judge "reduced to a footnote the material fact that the opponents of the other Towers did not present testimony from a real estate appraiser to contract the applicants' testimony that the special uses would not impact property values" is unavailing. (Doc. 40, 21.)  Indeed, as has been discussed in detail, the Magistrate Judge accurately concluded that McKeown's testimony failed to develop the relevant issues under the TCA with respect to comparing how Global's Tower would impact property values in relation to other permitted C Zoning uses or whether this alleged disproportionate impact would have a high probability of occurring.  Based on the deficiencies in this testimony, "the impact of Global's proposed tower has not been distinguished from such impact of the other two towers on the basis of property value impacts," (Doc. 37, 36), to justify the differential treatment between the three towers.  Also unconvincing is Hamilton's argument that there was no discriminatory treatment here because there was no evidence that the Sprint or PA Cellular's towers caused a negative impact on the public health, safety, and welfare, but Global's proposed Tower presents such a risk due the fact that "emergency service providers would have increased difficulty accessing the site in the event of an emergency due to a locked gate and fence."  Such a minor difference between the towers (especially in light of the fact that Global has offered to provide emergency responders with keys to unlock the gate) simply does not justify the differing treatment given to Global's Application when compared to the previously approved Sprint Spectrum and PA Cellular Towers.  Accordingly, as the structure, placement, and impact of the PA Cellular and Sprint towers are as, if not more, intrusive than Global's Tower, Hamilton unreasonably discriminated against Global in denying its Application.  The Magistrate Judge's recommendation that Global be granted summary judgment on its discrimination claim will therefore be adopted.

**B.     State Law Claim**

Global also contends that it is entitled to approval of its Application for special use and that the Board's decision constitutes an error of state zoning law.  Magistrate Judge Methvin recommends that Global's motion for summary judgment be granted as to this claim because (1) Hamilton did not oppose Global's request for summary judgment on this claim, and (2) the Board's decision denying Global's Application was not supported by substantial evidence. (Doc. 37, 48-49.)  Hamilton's objections to the R & R do not contest granting summary judgment as to this claim.  Finding no clear error with respect to these recommendations, the recommendation that Global be granted summary judgment on the state law claim will be adopted.

## IV. Conclusion

For the above stated reasons, the Report and Recommendation (Doc. 37) will be adopted.  Global's motion for summary judgment will be granted, and Hamilton's motion for summary judgment will be denied.  Furthermore, Defendants will be ordered to grant Global's Application and issue all necessary permits and variances. *See Ogden*, 504 F.3d at 397 ("the district court's order of March 30, 2006, ordering the Township to issue all required zoning permits and variances, and the order of February 15, 2007, ordering the issuance of any required Building Permits will be affirmed"); *T-Mobile Ne. LLC v. City of Lawrence*, 755 F. Supp. 2d 286, 292 (D. Mass. 2010) ("award of injunctive relief, rather than a remand, is often a preferred method of relief" in disputes over violations of the TCA).

An appropriate order follows.


 September 14, 2012                              /s/ A. Richard Caputo
Date                                             A. Richard Caputo
                                                 United States District Judge